# ROBERT B. JOHNSTON

*vs.*

# WILLIAM C. FREDERICK.

*Witness—Mental Incapacity—Presumption.*

A witness should not be debarred from testifying, on the ground of mental incapacity, unless the proof of such disqualification is clear and conclusive, the test of incompetency being whether the witness has sufficient understanding to appreciate the nature of an oath, and sufficient capacity to observe and describe correctly the facts in regard to which she is called to testify.                              pp. 274, 275

That an alienist testified that the witness in question would be apt to exaggerate and misrepresent in regard to matters on which she had delusions was no reason for barring her from testifying as to matters as to which she was not shown to have delusions.                              p. 281

The belief of the relatives of the proposed witness, as testified to by them, that her feeling against defendants would prompt her to misrepresent the facts to their disadvantage, is not a ground of disqualification.                              p. 282

One is not to be excluded from the witness stand because his hostility towards the party against whom his testimony is to be adduced may make it unreliable.                              p. 282

A ruling as to the incompetency of a witness by reason of lack of mental capacity is appealable.                              p. 282

*Decided January 13th, 1922.*

Appeal from the Court of Common Pleas of Baltimore City (BOND, J.).

Action by Robert B. Johnson against William C. Frederick and Isabelle Frederick. From a judgment in favor of the first named defendant, plaintiff appeals. Reversed.

The cause was argued before Boyd, C. J., Thomas, Pattison, Urner, Adkins, and Offutt, JJ.

*Eugene O'Dunne,* with whom were *Harry B. Wolf* and *Eugene Frederick* on the brief, for the appellant.

*Isaac Lobe Straus,* with whom were *W. W. Parker* and *Leonard Weinberg* on the brief, for the appellee.

Mrs. Schultheis was properly regarded as disqualified to testify. 28 *Ruling Case Law,* sec. 38; *People* v. *Enright,* 256 Ill. 221; *State* v. *Simes,* 85 Pac. 914; *Ann. Cas.* 1913 E, 318; *Roscoe, Crim. Evid.* (8th Am. Ed.), vol. 1, p. 179; *Ray, Med. Jur.* 528 *et seq.;* 1 *Wharton, Crim. Law,* sec. 752; *Waring* v. *Waring,* 12 Jur. 947; 46 *L. R. A.* (N. S.), p. 1030, note; *Rex.* v. *Hill, Cox, Crim. Cas.* 259.

The decision of the trial court as to the competency of an imbecile or feeble-minded person will not be disturbed unless there is a clear abuse of discretion, or the court admits or rejects the witness on an erroneous view of a legal principle. *Cogan* v. *Cogan,* 202 Mass. 60; *Ann. Cas.* 1913 E. 328; *Burns* v. *State,* 145 Wis. 373; *Wigmore, Evidence,* sec. 497; 2 *Elliott, Evidence,* sec. 753; *Underhill, Crim. Evid.* sec. 203; *Coleman* v. *Comm.,* 25 Gratt (Va.), 865; *State* v. *Simes,* 85 Pac. 914; *Roscoe's Crim. Evid.* (8th Am. Ed.), vol. 1, p. 179 *et seq.;* 46 *L. R. A. N. S.,* p. 1030, note.

Urner, J., delivered the opinion of the Court.

A very important question is presented on this appeal. It relates to the disqualification of a witness on the ground of mental incapacity. The suit was brought by a husband against persons alleged to have alienated his wife's affections. The defendants are William C. Frederick and his daughter, Isabelle Frederick, the latter of whom is charged with having directly caused the estrangement between the plaintiff and his wife, and the former with having encouraged and

promoted the conduct which produced that unfortunate re-
sult. At the trial of the case below, evidence was offered
tending to show that Miss Frederick possessed an abnormal
and demoralizing influence over the plaintiff's wife, and
exerted it so actively and persistently as to make inevitable
the alienation which in fact occurred. It was then proposed
to prove that Mr. Frederick had aided his daughter in the
course of conduct to which we have alluded. For this pur-
pose a sister-in-law of Mr. Frederick, by the name of Mrs.
Schultheis, was called as a witness, but objection being made
that she was mentally incompetent to testify, an inquiry was
conducted by the court on that subject, and she was held to
be disqualified. The admitted evidence was considered
legally insufficient to support a recovery against Mr. Fred-
erick, and a verdict in his favor was directed at the close of
the plaintiff's case. From the judgment entered on that ver-
dict the plaintiff has appealed. The record does not show
the result of the trial so far as Miss Frederick was concerned.

There are fifty-three bills of exceptions in the record, but
most of them relate to the admission of evidence to prove the
incompetency of the witness to whom we have referred.

The rule of law applicable to an inquiry into the mental
qualification of a witness has been stated by this Court in the
case of *Weeks* v. *State,* 126 Md. 227-8. In that case the de-
fendant was under indictment for having carnal knowledge
of a woman alleged to be an imbecile. The fact of her im-
becility was proven, but it was determined that she was
capable of testifying. In discussing that question the opin-
ion of the Court, delivered by JUDGE THOMAS, said: "The
fact that Carrie Waring was alleged or shown to be an imbe-
cile did not necessarily render her incompetent as a witness.
If an imbecile has sufficient understanding to appreciate
the nature and obligation of an oath and sufficient capacity
to observe and describe correctly the facts in regard to which
she is called to testify, there is no reason why her testimony
should be excluded. 2 *Russell, Crimes* (6th Ed.), 969; 1

*Greenleaf, Evidence* (13th Ed.), sections 365-367; *Hoch-heimer's Criminal Law*, sections 300-303; *State* v. *Meyers*, 37 L. R. A. 423, and note; *State* v. *Michael*, 19 L. R. A. 605, and note.   In 40 *Cyc.* 2201, it is said: 'An insane person may be a competent witness where, notwithstanding his affliction, he is capable of observing accurately and stating correctly what he observed and understanding the nature and obligation of an oath'; and in the case of *District of Columbia* v. *Armes*, 107 U. S. 519, the Supreme Court said: 'The general rule, therefore, is, that a lunatic or a person affected with insanity is admissible as a witness if he have sufficient understanding to apprehend the obligation of an oath, and to be capable of giving a correct account of the matters which he has seen or heard in reference to the questions at issue; and whether he have that understanding is a question to be determined by the Court, upon examination of the party himself, and any competent witness who can speak to the nature and extent of his insanity.' In 4 *Words and Phrases*, 3391-3392, imbeciles are said to be persons whose mental powers and resources are limited or whose minds are weak or feeble.   After an examination of her testimony and the testimony of the two physicians, we entirely agree with the conclusion of the learned court below that, while Carrie Waring was an imbecile, she was nevertheless competent to testify to the facts as to which she was interrogated.   The question of the competency of a witness is one to be determined by the Court, and should be disposed of as soon as it arises and before the witness is allowed to testify to the facts in issue.   *Hochheimer's Criminal Law*, section 300; *Arnd* v. *Amling*, 53 Md. 192; *Freeny* v. *Freeny*, 80 Md. 406; *District of Columbia* v. *Armes, supra.*"

The opinion from which we have just quoted makes unnecessary a further discussion of the principle upon which the present question is to be decided.   Our duty is to properly apply that principle to the testimony offered in this instance to prove the alleged disqualification.

The witness, Mrs. Schultheis, whose capacity to testify is to be considered, was about sixty-eight years of age at the time of the trial. When she first appeared on the witness stand the defendants, while objecting to her competency, had no testimony then available to sustain their objection, and she was allowed to be questioned for a time as to her relationship to the parties and as to the handwriting of certain letters which Miss Frederick was supposed to have written. The answers of Mrs. Schultheis to these inquiries appeared to be rational. Her testimony was then suspended for a hearing, before the court alone, of the question raised as to her sanity. In the course of this hearing she was recalled to the witness stand and interrogated by the court and counsel as a means of ascertaining her mental condition. The able judge who tried the case could not discover in the demeanor and replies of the witness any sufficient ground, as he stated, for declining to have the jury receive her testimony. Speaking as to the result of his own observation, he said: "If there is anything wrong, it seems to me to be very mild." So far as we can judge from the report in the record of the testimony of Mrs. Schultheis, it is coherent and intelligent. It does not compare unfavorably in those respects with the testimony of the average witness whose sanity is unquestioned. The trial judge solved the problem by ruling against the competency of the proffered witness in accordance with what he regarded as the weight of the independent evidence on the subject.

The first witness examined as to the mental condition of Mrs. Schultheis was her sister, Mrs. Wyman, who expressed the opinion that the former was incapable of testifying in this case. The reasons given for that opinion were that: "She imagines she is persecuted, people want to harm her and she is never treated right. That is the way her mind goes and we have done everything in the world to make it pleasant for her. * * * She has an excellent memory to carry tales and she has a convenient memory at times to keep things to

herself. * * * There is an exaggeration all the time." The witness did not consider her sister "capable of taking a good religious oath." "My sister," she said, "never hears a sermon unless it is at a funeral and we cannot prevail upon her to go to church." At the suggestion of a physician who was consulted about Mrs. Schultheis, the witness took her to the Phipps Clinic for examination.

The record of that investigation was offered in evidence. It includes, in addition to references to the family history, the following statements: "Chief complaint given by sister, general senility, talkative and cannot control herself. The patient says, 'it is not that bad. I have a cold. I am not crazy.' "Since her husband's death she has felt that the world was not treating her right, she did not have as much money as she ought. She nursed her sister, who died in April, and since her sister's death has felt ill-used, felt that she should have been paid and has been resentful toward her brother-in-law and niece." "She is very talkative, but this is nothing new. She has always talked of her troubles to others." "The patient is irritable, angry, and has frequent crying spells. Her mental status shows that she is irritable and cranky, contradicting angrily statements of sister. She talks about her troubles very much in detail and gives the impression of exaggeration. She is correctly oriented, retains nine digits with one transposition. Memory for past events: Born, July 31, 1853; married in 1870 at the age of 17. Husband died in 1892, when she was 39. Memory for the recent past correct. Grasp of general information good. Calculation, some transpositions. Apparently no insight. Diagnosis: Psycopath, with involutional exacerbation."

The term "psycopath" was later defined by an alienist, who testified for the defendants, as meaning one who is abnormal mentally from birth. It is "applied to an individual who is born with or all his life has an abnormal mental state, irrespective of what that particular state is so long as it is abnormal or different from the normal, so that

it is a very broad classification." The words "involuntary exacerbation," as used in the clinic report, meant "an increase in her symptoms due to old age." The alienist said that a psycopath may be not irresponsible.

After being examined at the Phipps Clinic, Mrs. Schultheis left the hospital and continued her usual course of life. Dr. Houck, at whose suggestion she had been taken to the clinic for examination, testified that when Mrs. Wyman spoke to him about having her sister declared insane he told her she was very foolish, "and then," he said, "I referred her to the Phipps Clinic, and I think they sustained my ideas." He further testified that he had been visited by Mrs. Schultheis several times about some minor ailment, and that he did not observe anything wrong with her mind.

George W. Hoffman, a brother of Mrs. Schultheis, after stating that he thought his sister incapable of testifying, was asked by the court: "Suppose you and she should enter into a contract, would she be able to tell what she did then and recognize her signature?" To which he replied: "I could not tell that close in that short time. She may be able to." (Q.) "But you think that time would make some difference?" (A.) "Yes; I think it would."

Mrs. Rose, a niece of Mrs. Schultheis, testified that she considered her aunt mentally irresponsible. This opinion was based on "the fact that she is very indiscreet in the manner in which she talks about things which should be private property, or personal affairs, and the people whom she selects to talk these things over with," and she "has no sense of propriety about anything when she gets started on her favorite line of talk. She is very vindictive in her manner" and "exceedingly jealous." To the inquiry whether Mrs. Schultheis could understand the obligation of an oath, the witness answered: "I think she is possessed of sufficient cunning as against people of her like to realize the possibility that it might mean for her to serve her own ends." In answer to the question whether her aunt would know

what the words of the oath meant, the niece said: "Yes, she would know what they meant, but I think she is of an unscrupulous nature, and would not hesitate to say things that would help her." The witness further said that she thought her aunt had delusions about being persecuted, that she had "a very monotonous way of repeating things," and that her descriptions were "exaggerated and imaginative." On cross-examination the witness stated, as reasons why she considered her aunt incompetent, that "she is vindictive, jealous and indiscreet and unscrupulous, and she talks about her daughter-in-law," and "to anybody of normal mind it would seem to indicate that a person who would try to damage a person's character and reputation, as she is now doing, was not normal."

Dr. Gillis, the alienist to whom reference has been made, testified, on the basis of the Phipps Clinic report and the testimony of Mrs. Wyman, Mr. Hoffman, and Mrs. Ruse, which he had heard, that he did not think Mrs. Schultheis was mentally capable of appreciating the obligation of an oath or of accurately describing facts with respect to the character and conduct of a person about whom she might be interrogated. It was admitted by the witness that a personal examination, which he had not made, would be a more satisfactory basis for an opinion as to the mental condition of Mrs. Schultheis, and that he was relying on the diagnosis made at the Phipps Clinic. When recalled after Mrs. Schultheis herself had been questioned, Dr. Gillis further testified in part as follows: "I do not think she is mentally competent to testify in this case. * * * Because she shows definite signs of persecutory ideas, especially against the defendants in this case, and, for that reason, her testimony would not be mentally competent. * * * It would be a narration of fact, probably, but very much exaggerated, colored, by her delusionary trend. * * * She may understand, generally, the nature of the oath, but if the matter she is to testify about has any relation to matters on which she has

delusions or ideas of persecutory type, then, of course, her
idea of an oath would not be a proper one; in other words,
she may know what an oath means, but when it comes to
making statements about persons, or things, that she weaves
into her delusionary trend, then, of course, she is very likely
to exaggerate and misrepresent."

The eldest son of Mrs. Schultheis testified that his mother
is "extremely imaginary at times," and has delusions as to
being persecuted, thinking that "almost anyone she 'ever
associated with is trying to do her an injustice." Being
asked whether his mother thought that Mr. Frederick had
persecuted or wronged her, the witness said: "Yes; she has
told me so." (The Court): "Has told you what?" (The
Witness): "That he has done her a great injustice." In
the opinion of this witness, Mrs. Schultheis is not mentally
capable of understanding the nature and obligation of an
oath and of testifying correctly as to past occurrences, and
particularly as to the conduct of the defendants, because
"she would be too biased and prejudiced to answer prop-
erly."

Mrs. Essig, a sister of Mrs. Schultheis, having expressed
the view that the latter could not accurately describe the
conduct of the defendants in relation to this case, was asked
her reason for that opinion, and replied: "She may exag-
gerate some things." When questioned as to what delusions
her sister had, the witness said: "She imagines she really
was more than what she is," "she was expecting to be a
wealthy woman some day." Another instance given of a
delusion was: "She would give her own children away some
time," because "she would say they didn't act right towards
her." Later in her testimony the witness said: "I am sorry
anything like this should have happened, for my sister to be
so foolish and turn on her own family."

Dr. Fawcett, a physician who has had experience in the
treatment of mental diseases, and who interviewed Mrs.
Schultheis, testified that in his opinion she was capable of

understanding the obligation of an oath "as well as about ninety-five per cent. of those who come on the witness stand," and was undoubtedly competent to testify as to facts which came under her observation. He said: "After a half-hour's conversation with her, I found that she had no delusions, and that she had no unreasonable suspicions, and the only thing that I can say, which would not be called abnormal, in a woman of her age, is that she is unusually garrulous."

The oral opinion of the trial judge, as reported in the record, indicates that he regarded the question before him as involved in doubt and difficulty. "I had a strong inclination," he said, "to pass this question over to the jury and leave it to them to pass upon the value of the testimony." In our judgment, that would have been the better course. A witness should not be debarred from testifying on the ground of mental incapacity unless the proof of such disqualification is clear and conclusive. The test of incompetency is whether the witness has "sufficient understanding to appreciate the nature and obligation of an oath and sufficient capacity to observe and describe correctly the facts in regard to which she is called to testify." The conclusion of the alienist witness for the defendants, after he had seen and heard Mrs. Schultheis under examination, was that she could understand the nature of an oath, but that she would be apt to "exaggerate and misrepresent" in regard to "matters on which she has delusions or ideas of a persecutory type." The subject about which Mrs. Schultheis had been called to testify was the conduct of the defendants alleged in the declaration. There was no satisfactory proof that she was afflicted with a delusion on that subject. To assume the existence of such a delusion would be to make an assumption adverse to the plaintiff upon the very issue which he was entitled to have tried and determined. There was evidence tending to show that the witness was hostile to the defendants, but this appears to have been due to her belief that Mr. Frederick had "done her a great injustice" in not com-

pensating her for services rendered. As to whether or not there was any basis for that view we are not informed by the evidence.

It is apparent from the testimony of the relatives of Mrs. Schultheis, who expressed opinions unfavorable to her competency, that their principal concern was not as to her capacity, but as to her disposition to testify truthfully in this case. They were evidently objecting to her as a witness because of their belief that her feeling against the defendants would prompt her to misrepresent the facts to their disadvantage. This belief may have been sincere, but it is not a sufficient ground of disqualification. The competency of a witness to testify cannot be denied merely because of apprehensions that his testimony may not be truthful. If he is *capable* of appreciating his oath and of testifying correctly, he is not to be rejected altogether because of proof that he might be disposed to disregard that obligation. There is the right and opportunity to dispute the credibility of a witness after he has testified by proof that he is prejudiced or unworthy of belief. But he could not be excluded from the witness stand on the ground that his testimony would be unreliable as a result of hostility towards the party against whom it is adduced.

Upon the question as to the mental capacity of the witness under investigation in this case we do not find the evidence sufficiently conclusive to justify the ruling by which the objection to her competency was sustained. It is, of course, an appealable ruling, and while it is entitled to the benefit of special presumptions, in view of the nature and method of adjudication of the question involved, we are unable to concur in the conclusion upon that point which the court below eventually reached.

Independently of the testimony proposed to be elicited from the witness who was held to be disqualified, there was no evidence legally sufficient to support the liability charged against the appellee, and the action of the court in so ruling upon the admitted evidence was proper.

Of the fifty-two exceptions to the admission of evidence, all but five were taken in the course of the hearing before the court alone upon the question of the qualification of the witness who was rejected. It is unnecessary to pass upon each of those exceptions, because upon the assumption that the evidence objected to was all admissible, we have found it insufficient to sustain the theory upon which it was offered. The ruling which we have mainly considered and in which we find reversible error, is the subject of the fifty-second exception. The five objections to evidence not relating to the disqualification issue were properly overruled.

*Judgment reversed, with costs, and new trial awarded.*