# W. LESTER DAVIS ET AL. *v.* CLAIBORNE E. CORBIN

[No. 906, September Term, 1974.]

*Decided October 31, 1975.*

The cause was argued before POWERS, GILBERT and DAVIDSON, JJ.

*Patrick A. O'Doherty,* with whom was *Hamilton O'Dunne* on the brief, for appellants.

*George W. White, Jr.,* and *Philip O. Foard,* with whom were *White, Mindel, Clarke & Hill* on the brief, for appellee.

POWERS, J., delivered the opinion of the Court.

Claiborne E. Corbin, appellee here, filed a bill of complaint in the Circuit Court for Harford County, on 29 January 1973, against two individual defendants and six corporate defendants. The suit sought to establish that Corbin was the owner of a one-half interest in Spartan Concrete Corporation, one of the corporations, and to require the other corporate defendants and the individual defendants to account to Spartan for business, money, and other assets of Spartan which Corbin alleged had been wrongfully diverted from it by the other defendants.

The individual defendants were W. Lester Davis and his wife, Virginia R. Davis. The corporate defendants in addition to Spartan Concrete Corporation were Aberdeen Sand & Gravel Co., Inc., t/a Bel Air Concrete Company, The Aberdeen Concrete Company, The Joppa Concrete Company, Davis Concrete Company, and D. and L. Products Corporation.

An answer to the complaint was filed on behalf of all

defendants. The significant allegations of the bill of complaint were denied. In addition, the answer contained seven affirmative defenses. Briefly stated, they were laches, statute of limitations, denial of partnership, denial of execution of relevant written documents, general issue plea in contract, general issue plea in tort, and an assertion that the complaint failed to state a cause of action for which equitable relief could be granted, which we take to be in the nature of a demurrer.

The case was tried in the Circuit Court for Harford County before Judge Albert P. Close, on 20, 21, 22, 25 and 26 February 1974. At the conclusion of the trial the case was taken under advisement. In a memorandum opinion filed on 19 September 1974, Judge Close ruled admissible the testimony of Corbin concerning his transaction with Davis, and ruled in favor of Corbin on the substantive issues in the case. A decree signed on 14 November, filed on 15 November 1974 granted the relief prayed in the bill of complaint. The defendants noted this appeal from that decree.

In their brief here the appellants argue two points. One is the admissibility of certain testimony given by Corbin, and the other is whether laches by Corbin in bringing this suit bars him from asserting his claim. Appellants word the questions presented in their brief in this way:

"1. Was the Defendant incompetent so as to render the testimony of the Plaintiff inadmissible concerning transactions with him?

"2. Did the Plaintiff act with the required legal diligence in pursuing the claim of ownership in Spartan which he asserts in this proceeding?"

In his brief, Corbin, as appellee, in effect puts the same questions, but does so in terms of the facts upon which the chancellor's rulings were based rather than upon the rulings themselves. Corbin presents the questions:

"1. Was the Court below clearly erroneous in finding as a fact, that the Defendant, Davis, was not mentally disabled under the provisions of the Dead Man's Statute?

"2. Was the Court below as the trier of fact clearly erroneous in finding that Corbin did not have actual knowledge prior to March of 1972 of Davis' intention to deny his 50% ownership of Spartan; and that there were no facts or occurrences to put a person of ordinary prudence and diligence on notice of any such intention particularly where as here Davis actively concealed and disavowed any such intention by affirming their relationship and acknowledging his obligation to Corbin upon every inquiry?"

In a reply brief appellants set out in full the fourteen page memorandum opinion filed by the chancellor, and then pose three questions. Two are substantially the same as those argued in their initial brief. The additional question is:

"1. Was the Court below in error in holding that the parties were joint venturers or partners?"

The transcript of the trial before Judge Close covers 960 typewritten pages, recording the testimony of 23 witnesses and the introduction of some 50 exhibits. We feel, however, that the facts we summarize below will be sufficient for the purpose of the issues involved in this appeal.

In 1962 Davis was engaged in rather extensive business enterprises in Harford and Cecil Counties, including the operation of plants from which he sold mixed concrete. At that time the Spartan Concrete Corporation, located in Bel Air, was owned and operated by members of the Sparr family. Some members of the family had conversations with Corbin, looking to the possible purchase of the business by him. Corbin spoke to Davis about buying Spartan, but at that time Davis said he was not interested. Later the two discussed it again, after the Sparrs had also talked to Davis. There was evidence that Davis and Corbin agreed to acquire the Spartan Corporation on a fifty-fifty basis.

On 3 August 1962 there was a meeting, attended by Davis, Corbin, several members of the Sparr family, and an attorney whom Davis had asked to attend. At Davis's direction the attorney had prepared an agreement between

the Sparrs and Davis for the sale. The sale was consummated on the same day. The price was $96,000, plus the assumption of obligations of Spartan. Three notes, two for $40,000 each and one for $16,000, representing loans from a local bank, provided the funds with which the purchase was accomplished. The two $40,000 notes were signed "Spartan Concrete Co., Inc., T/A Davis & Corbin Concrete Co., W. Lester Davis, Pres.". Under that signature was the personal signature, of Claiborne E. Corbin. On the back, as an endorser, was the signature W. Lester Davis. The third note for $16,000 was not signed in any business name but was signed only with the individual signatures, W. Lester Davis and Claiborne E. Corbin. Each of the several members of the Sparr family who held stock in Spartan turned in his certificates with the assignment executed and received a check for his share of the agreed price.

In evidence was a single sheet of paper upon which are recorded the minutes of two separate corporate meetings, both dated August 3, 1962. The first is designated as a stockholders' meeting of Spartan. Those minutes recorded that the stockholders elected as Directors for the ensuing year, W. Lester Davis, Virginia Davis, C. E. Corbin, and Marie Corbin. The minutes further record that the President announced that he and other present officers were disposing of the stock and that all of the present officers tendered their resignations, effective immediately.

The lower half of the same sheet records the minutes of a meeting of Directors of Spartan on the same day. Those minutes state that following the adjournment of the stockholders' meeting the new Directors, being also all of the outstanding stockholders, having purchased the outstanding stock of Leroy A. Sparr and other members of his family, organized by electing the following new officers: President, W. Lester Davis; Vice President, C. E. Corbin; Treasurer, Virginia Davis, and Secretary, Marie Corbin.

A bank account was opened and maintained by the business in the name of Davis & Corbin Concrete Co., W. Lester Davis or Claiborne Corbin. In many ways shown by the evidence the business was openly conducted as Davis &

Corbin Concrete Company, sometimes as Spartan Concrete Corporation, trading as Davis & Corbin Concrete Co. The October 1973 issue of the telephone directory carried an advertisement in the yellow pages by Spartan Concrete Corp., trading as Davis & Corbin. Corbin received a weekly paycheck from the business, by check drawn on an account carried under the name of Davis & Corbin Concrete Co. One of such payroll checks, dated 1 July 1972, was placed in evidence.

There was also evidence that in September, 1963, Mr. and Mrs. Davis and the family of one William M. Lindenstruth agreed to combine all of the concrete mixing plants they owned by transferring all of the stock of the respective corporations to a holding corporation, to be chartered by the parties, in which each family was to have a 50% stock interest. It appears that the operations were promptly combined in fact, although the new corporation, D. and L. Products Corporation, was not actually formed until 1965. Some, and perhaps all, of the securities of the other corporations were assigned to D. and L. Products in 1967, dated back to 1965. By a separate assignment dated "as of March 17, 1965" Davis assigned what he described as "all of the Capital Stock standing in my name on the books of said Corporation [Spartan]" to D. and L. Products Corporation. There was no evidence that the Spartan certificates turned in by the Sparr family in August, 1962, have ever been transferred on any corporate records maintained by Spartan.

Davis managed the combined operation of the so-called Davis companies and Lindenstruth companies from the time of the 1963 agreement until 1967, when Mr. and Mrs. Davis acquired the stock of the Lindenstruth family in D. and L. Products Corporation. The following year after The Aberdeen Sand and Gravel Co., Inc., which operated a concrete mixing plant in Bel Air under the name of Bel Air Concrete Company, came under the management of Davis, Davis moved its operation to Spartan's location, which adjoined.

Corbin from time to time complained to Davis that

business originated by Spartan was actually being diverted to and billed by Bel Air, and that Bel Air was filling its orders by using materials paid for and stockpiled by Spartan. There was evidence that on several occasions when the subject was brought up Davis agreed that he owed Corbin a lot of money, and promised that the matter would be straightened out. Such evidence, if true, would support not only the claim that assets of Spartan had been diverted to a company in which Corbin had no interest, but would show that Davis recognized Corbin's right, as part owner of Spartan, to raise the question.

A deed in evidence shows that on 1 May 1967 Davis and Corbin, as tenants in common, acquired four acres of land in Harford County. Corbin testified that their purpose was eventually to relocate Spartan's concrete mixing plant, and that each paid one half of the purchase price of $10,000. Another exhibit shows that an attorney working on an estate plan for Corbin wrote to Davis's accounting firm in 1969 asking for details of Corbin's 50% interest in Spartan Concrete Company.

Corbin testified that he talked to Davis several times about Spartan. Davis said that he would take care of it, that "one of these days we will straighten out." Corbin knew that Davis had other problems, with payments to the Lindenstruths, and with Internal Revenue. Corbin testified:

> "I said, Les, don't worry about me. I said, I am not going to put any pressure or anything like that. You go ahead. You've got troubles. We will straighten it up. He said, that is fine. We will do that. That is the way we left and I was happy and I think it was in — I know I heard several remarks saying that I called up all the time. Well, I did, I might have called up but he called me first. He said in 19, let me think now, about 1971 in about December, it was really a break of the day, he told me, called me on the phone, said, Bud, I know I owe you a lot of money, and he said, I am going to straighten up with you. I said, well, Les, that is fine. I was hoping we could really straighten up and

have no troubles. He said, well, he says, we will do that * * *."

Corbin said Davis was to let him know when, and it went on about three months. He testified:

"I think it was April or March of '72, I called Les up. I said, Les, I said, when are we going to get straightened out? I suggested in December and it is March now. When are we — going into another season — are we going to straighten out? He said, straighten out what? I said, the business. He said, you don't own no business. I said, you have to be kidding. He said, no. I'm not kidding. If you think I am kidding, send your lawyer over and find out. I said, you are serious, aren't you? He said, you're damn right I'm serious. I said, okay, I will do just what you said."

In a letter dated 11 April 1972 Corbin's attorney sent to Davis's attorney certain financial information and copies of supporting papers. Davis's attorney wrote to Davis on 13 April 1972, sending a copy of what he had received. He said:

"This report should aid Mr. Flom in setting up a proper account, which apparently your previous auditor had not done.

"You will also note that Mr. Corbin is ready to sever the relationship, which I presume is being indicated by Mr. Mittelman that you either offer to buy or sell."

On 23 May 1972 Davis's attorney wrote Corbin's attorney, making an offer for Corbin's interest. The letter was objected to because it disclosed an offer to compromise. In a further letter, 26 September 1972, Davis's counsel confirmed a telephone conversation with Corbin's counsel in which he had advised, "that we have now found the records in connection with Spartan Company, to show that Mr. Corbin is the vice-president of the Company and his wife is the secretary, which changes the situation as we all had thought existed prior to the search of the records." The letter

suggested a willingness to discuss the matter further after completion of an audit of Corbin's records.

We do not look upon any of the evidence we have referred to showing what happened in 1972 as supporting, even inferentially, Corbin's substantive claim. We confine our consideration of that evidence to its bearing on the defense of laches raised by Davis.

### Admissibility of Corbin's Testimony Under the Dead Man's Statute

At the outset of the trial counsel for Davis sought a ruling that Corbin would not be permitted to testify concerning any transaction with Davis because it was claimed that Davis was, at the time of trial, incompetent. The law of evidence which was sought to be invoked was, of course, the so-called Dead Man's Statute. The statute in effect at the time is found in Code, Courts Art., § 9-116, which says, in part:

> "A party to a proceeding by or against a personal representative, heir, devisee, distributee, or legatee, or by or against an incompetent person, may not testify concerning any transaction with or statement made by the dead or incompetent person, * * * ."

Concerning changes in wording from the statute as it existed prior to 1 January 1974, the Revisor's Note explains:

> "While modernizing the language and simplifying the sentence structure for clarification purposes, every effort is made to retain the exact purpose of the statute as it is construed and as it is presently written."

For comparison we set out a part of Code, Art. 35, § 3, which was in effect from 1902 until 1 January 1974:

> "In actions or proceedings by or against executors, administrators, heirs, devisees, legatees or distributees of a decedent as such, in which judgments or decrees may be rendered for or

against them, and in proceedings by or against persons incompetent to testify by reason of mental disability, no party to the cause shall be allowed to testify as to any transaction had with, or statement made by the testator, intestate ancestor or party so incompetent to testify * * * ."

After consideration of the positions of the parties on the question of admissibility of Corbin's testimony, the chancellor reserved his decision, and stated that he was going to hear the case as though the issue were not before him. In his subsequent memorandum, the chancellor ruled that Corbin's testimony concerning transactions with Davis was admissible.

No appellate decision in Maryland has ever construed that part of the dead man's statute relating to incompetence of a living party. It is necessary that we do so now. Initially, we hold that the present phrase, "incompetent person", was intended to have and does have the same meaning as the former phrase, "person incompetent to testify by reason of mental disability".

In his memorandum opinion Judge Close summarized the evidence on the question of whether Davis was incompetent to testify by reason of mental disability as follows:

"Virginia R. Davis, Defendant and wife of W. Lester Davis, testified that he is presently paralyzed, his speech is very bad and he cannot communicate. His first heart attack occurred in October of 1968 and a second shortly thereafter. In the spring of 1971, he suffered a subarachnoid hemorrhage or aneurysm which occasioned a loss of memory. He suffered a second stroke in November of 1972 and the last to date in February of 1974. Dr. John Russell Davis, his personal physician testified essentially to the same chronology of medical accidents suffered by W. Lester Davis and stated that it was his opinion that his patient was incompetent to 'handle or transact affairs'. His memory was impaired prior to and his condition

has worsened since November of 1972 at which time he doubted that he would have been competent to testify.

"Plaintiff produced Leonard J. Gallant, a licensed physician trained in medicine, neurology, psychoanalysis and psychiatry, specializing in psychiatry who felt that W. Lester Davis was competent to handle his own affairs as one who has a mild cardiovascular disease that seems well compensated for at this time, admitting that he may have had periods of lack of memory of short duration, interspersed with periods of good memory and competency. Plaintiff also introduced evidence to show that since 1971 W. Lester Davis had continued to pursue a fairly active business life.

"R. Raymond Mitchell, President of the Aberdeen National Bank, testified as to Davis' activities as a Director and Chairman of the Executive Committee, James Robert Hooper testified as to negotiations concerning the rental of property in September of 1973, and T. Carroll Brown testified with regard to a winding course of financing, foreclosure bankruptcy, and purchase at foreclosure in which Davis was a constant participant and ultimate purchaser of a large quarry operation, including the executing of papers as late as January, 1974."

The chancellor concluded with this ruling:

"In the face of the facts developed by the testimony, and the requirements of Subtitle R., Minors and Persons under Disability of the Maryland Rules of Procedure that a formal proceeding be initiated in Court by Petition of an interested person accompanied by the signed and verified certificates to two physicians in order to determine whether or not one is a disabled person who is unable to manage his personal affairs, this is

clearly not a case where the protection afforded by Article 35, Section 3, [Courts Art., § 9-116] should be invoked."

Appellants argue that the trial judge erred in holding that formal adjudication of incompetency was the sole test to determine admissibility of evidence under the statute. We do not read the ruling below as so holding. The ruling was prefaced by a reference to "the facts developed by the testimony", as well as a reference to the lack of a formal adjudication proceeding. In any event, our inquiry looks to the result.

"Qualification or competency is largely within the discretion of the trial court," *Horsey v. State,* 225 Md. 80, 82, 169 A. 2d 457 (1961). In *Sun Cab Co. v. Carter,* 14 Md. App. 395, 287 A. 2d 73 (1972), we said, at 407:

> "In so far as the contention goes to the competency of Carter to testify, this was a matter in the discretion of the trial court. It had the opportunity to observe Carter on the stand and had knowledge of the explanations given by him. We cannot say that the receipt of his testimony was an abuse of judicial discretion."

The discretion thus reposed in the trial judge is, of course, to be exercised by application of recognized legal principles. Those principles have been stated in several cases by the Court of Appeals. In *Terry v. O'Neal,* 194 Md. 680, 72 A. 2d 26 (1950), the Court said, at 688:

> "Even imbeciles and lunatics have been permitted to testify where there is a showing of probable capacity. 'A witness should not be debarred from testifying on the ground of mental incapacity unless the proof of such disqualification is clear and conclusive.' *Johnston v. Frederick,* 140 Md. 272, 281, 117 A. 768; *Weeks v. State,* 126 Md. 223, 227, 94 A. 774; Wigmore, Evidence, 3d Ed., § 492."

In *Johnston v. Frederick,* 140 Md. 272, 117 A. 768 (1922), cited in *Terry v. O'Neal, supra,* the Court quoted at length

from *Weeks v. State,* 126 Md. 223, 94 A. 774 (1915). In *Weeks* the defendant was being tried on a charge of carnally knowing an imbecile. When the victim was called to testify, Weeks questioned her competency. In affirming the conviction of the appellant the Court of Appeals said in *Weeks,* at 228:

" * * * in the case of *District of Columbia v. Armes,* 107 U. S. 519, the Supreme Court said: 'The general rule, therefore, is, that a lunatic or a person affected with insanity is admissible as a witness if he have sufficient understanding to apprehend the obligation of an oath, and to be capable of giving a correct account of the matters which he has seen or heard in reference to the questions at issue; and whether he have that understanding is a question to be determined by the Court, upon examination of the party himself, and any competent witness who can speak to the nature and extent of his insanity.' In 4 *Words and Phrases,* 3391-3392, imbeciles are said to be persons whose mental powers and resources are limited or whose minds are weak or feeble. After an examination of her testimony and the testimony of the two physicians, we entirely agree with the conclusion of the learned Court below that, while Carrie Waring was an imbecile, she was nevertheless competent to testify to the facts as to which she was interrogated."

The ruling by the chancellor that Davis was not incompetent and that Corbin's testimony concerning transactions with Davis was not thereby rendered inadmissible under Courts Art. § 9-116 was a proper exercise, and was not an abuse, of the chancellor's discretion.

### The Defense of Laches

Defining laches is not as difficult as applying it. The Court of Appeals said in *Parker v. Board of Election Supervisors,* 230 Md. 126, 186 A. 2d 195 (1962), at 130-31:

"This Court has had occasion to deal with the question of laches many times. It is a defense in equity against stale claims, and is based upon grounds of sound public policy by discouraging fusty demands for the peace of society. There is no inflexible rule as to what constitutes, or what does not constitute, laches; hence its existence must be determined by the facts and circumstances of each case. *Brashears v. Collison*, 207 Md. 339, 115 A. 2d 289. The devolution of time, alone, does not constitute laches; it is but one of the many circumstances from which a determination of what constitutes an unreasonable and unjustifiable delay may be made. In a purely equitable action, a lapse of time shorter than the period of limitations may be sufficient to invoke the doctrine; and, where the delay is of less duration than the statute of limitations, the defense of laches must include an unjustifiable delay and some prejudice to the defendant. What amounts to 'prejudice,' such as will bar the right to assert a claim after the passage of time, depends upon the facts and circumstances of each case, but it is generally held to be anything that places him in a less favorable position. And, since laches implies negligence in not asserting a right within a reasonable time after its discovery, a party must have had knowledge, or the means of knowledge, of the facts which created his cause of action in order for him to be guilty of laches."

A thumbnail definition, coupled with a further explanation of what may be alleged as a change of position for the worse is found in *Staley v. Staley*, 251 Md. 701, 248 A. 2d 655 (1968), where the Court said, at 703:

"The doctrine of laches is an application of the general principles of estoppel, and consists of two elements — negligence or lack of diligence on the part of the plaintiff in failing to assert his right, and prejudice or injury to the defendant. *Parker v.*

*Board of Elec. Sup.*, 230 Md. 126, 186 A. 2d 195; *Croyle v. Croyle*, 184 Md. 126, 40 A. 2d 374. As set out in *Croyle*: 'The very heart of the doctrine of estoppel, through laches, is that the defendant's alleged change of position for the worse must have been induced by, or resulted from, the conduct, misrepresentation or silence of the plaintiff.' "

The principle of equitable estoppel, of which the doctrine of laches is said to be an application, is defined in 3 Pomeroy, *Equity Jurisprudence*, (5th ed. 1941), § 804, as follows:

"Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right, either of property, of contract, or of remedy."

It is abundantly clear that there was evidence in this case sufficient to support the finding by the chancellor of a factual pattern of conduct which would permit Corbin to assert his claim, free of a defense of laches or equitable estoppel. The factual conclusions of the chancellor were not clearly erroneous. Maryland Rule 1086. He correctly applied the law to those facts.

### The Finding That Corbin Owned One-Half of Spartan

In their reply brief appellants assert that the court below erred in holding that the parties were joint venturers or partners. They argue this issue by saying that the court incorrectly applied a burden or burdens of proof. We are concerned on appeal with the legal sufficiency of evidence to support findings — not with burdens of persuasion, which are matters of weight and credibility of evidence.

The evidence before the chancellor in this case was sufficient to support a finding that Davis and Corbin acquired Spartan Concrete Corporation together, with the intention that each would own one half. The chancellor so found. His finding was not clearly erroneous, and we may not set aside the judgment based on that finding. Maryland Rule 1086.

Appellants do not question the mechanics set up in the decree to accomplish what the chancellor found to be the substantial rights of the parties. Whether it would have been more correct form to require the issuance of stock in Spartan to Corbin, and to proceed from there, rather than to hold that Corbin and Davis were partners in owning Spartan, does not affect the substance of the decree, and is not before us.

*Decree affirmed.*
*Costs to be paid by appellants.*