499 A.2d 1261

**Vernon Lee EVANS, Jr.**

**v.**

**STATE of Maryland.**

**Nos. 66, 98, Sept. Term, 1984.**

Court of Appeals of Maryland.

Nov. 12, 1985.

Gary S. Offutt and George E. Burns, Jr., Asst. Public Defenders (Alan H. Murrell, Public Defender, on brief), Baltimore, for appellant.

Richard B. Rosenblatt, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen., on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., SMITH, ELDRIDGE, COLE, RODOWSKY and McAULIFFE, JJ., and W. ALBERT MENCHINE, Associate Judge of the Court of Special Appeals (retired), Specially Assigned.

ELDRIDGE, Judge.

The defendant-appellant, Vernon Lee Evans, Jr., was found guilty of first degree murder and related offenses by a jury in the Circuit Court for Worcester County, with Judge Dale Cathell presiding. The same jury determined that the appropriate sentence was death. On this appeal, Evans challenges the verdict and sentence on a multitude of grounds. As we conclude that none of these grounds involve reversible error, we shall affirm.

The basic facts of the case are as follows. According to the State's evidence, the defendant Evans and Anthony Grandison entered into an agreement whereby Evans would kill David Scott Piechowicz and his wife, Cheryl, because the couple were scheduled to testify against Grandison in a narcotics case pending in the United States District Court for the District of Maryland. Evans was to receive $9,000.00 from Grandison for performing the murders.

David Scott Piechowicz and Cheryl Piechowicz were employed at the Warren House Motel in Baltimore County. On April 28, 1983, Susan Kennedy, the sister of Cheryl

Piechowicz, was working in place of Cheryl at the Warren House Motel. The evidence was sufficient to prove beyond a reasonable doubt that, on April 28th, Evans went to the motel and, not knowing the Piechowiczs, shot David Scott Piechowicz and Susan Kennedy with a MAC–11 machine pistol. Nineteen bullets were fired at the victims, who died from the multiple gunshot wounds.

A two count indictment was filed against Evans and Grandison in the United States District Court. They were charged with violating the Piechowiczs' civil rights by interfering with their right to be witnesses in a judicial proceeding, in violation of 18 U.S.C. § 241, and with witness tampering, in violation of 18 U.S.C. § 1512.

Subsequently the present case began with a four count indictment in the Circuit Court for Baltimore County, charging Evans and Grandison each with two counts of first degree murder, one count of conspiracy to commit murder, and use of a handgun in the commission of a felony or crime of violence. Upon the defendants' requests for removal, Grandison's trial was transferred to the Circuit Court for Somerset County and Evans's trial was transferred to the Circuit Court for Worcester County.

Prior to the trial in the instant case, Evans was convicted on the federal charges and sentenced to life plus ten years imprisonment. He then filed a pretrial motion to dismiss the charges in this case on double jeopardy grounds. The motion was denied by the trial judge, and this Court affirmed. *Evans v. State*, 301 Md. 45, 481 A.2d 1135 (1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 1411, 84 L.Ed.2d 795 (1985).

Thereafter the trial in the present case proceeded. Among the witnesses offering significant incriminating evidence against the defendant Evans were Janet Moore, Charlene Sparrow and Calvin Harper. Moore, Grandison's girlfriend, had been contacted by Grandison, who was then in the Baltimore City Jail, to assist in making arrangements for the murder of the witnesses. Sparrow was Evans's

girlfriend and offered the most damaging testimony about the defendant's involvement as the killer. According to Sparrow, she had accompanied the defendant and Moore to the Baltimore City Jail where the latter two visited Grandison two days before the shooting, inspected the reception desk area of the Warren House Hotel, and reported to the defendant concerning the people working there and the presence or absence of security features. Sparrow testified that, at the request of the defendant and with his funds, she obtained a room at the motel, was with the defendant in the immediate area of the lobby at the time of the shooting, and wiped down the smoking MAC–11 machine pistol handed to her by the defendant immediately after the shooting. She related that the defendant told her that he would receive $9,000.00 "if he knocked both of them off." Harper's testimony involved activities of April 26, 27 and 28, 1983, and included a description of the defendant's acquisition of the machine pistol from Rodney Kelly, as well as the defendant's statement that he liked the gun.

We shall now address the defendant's arguments, essentially in the order set forth in his brief.

## I.

The defendant's first two arguments relate to Calvin Harper's trial testimony. Harper testified that he was with a friend, Rodney Kelly, during April 26, 27 and 28, 1983, and that on April 26th Kelly showed him a machine pistol like the MAC–11 machine pistol shown to him at trial. Harper further testified that on April 27th, Kelly introduced him to the defendant Evans, calling Evans by the name "Shorty." Harper went on to testify concerning Shorty's approval and acquisition of the machine pistol.

Following Harper's testimony, the defendant's attorneys were furnished a transcript of Harper's earlier testimony before a state grand jury, and upon reading the transcript the attorneys discovered that Harper had earlier identified the defendant Evans during that grand jury proceeding,

when shown a single photograph of Evans.[1] Defense counsel promptly contended that, as a result of the circumstances surrounding the earlier identification, the in-court identification should not have been permitted, and counsel moved for a mistrial. The trial judge declined to grant a mistrial, but he allowed a motion to suppress the in-court identification and promptly held a hearing on that motion out of the presence of the jury.

In connection with the suppression hearing, the State stipulated to the introduction of the grand jury transcript, made available to defense counsel for interview the Assistant State's Attorney who had questioned Harper before the grand jury, and arranged for the return of Harper from Princess Anne, where he had been taken to testify against Grandison in the latter's trial. The record discloses that the identification before the grand jury occurred in the following manner:

"Q. PROSECUTING ATTORNEY: As you were playing games with Rodney in the bar, a fellow by the name of Shorty comes in, calls Rodney, and Rodney and Shorty go outside, is that right?

"A. HARPER: Right.

"Q. PROSECUTING ATTORNEY: Now, I show you a Baltimore County Police photograph No. 126237. It is a mug shot, and next to that number are the numbers 6/08/83, indicating the date. Is this the Shorty that you saw?

"A. HARPER: That is him.

---

1. Evans had earlier learned from counsel who had represented him in the federal case that Harper had made an identification of him when shown a single photograph. Evans had relayed this information to trial counsel in this case, who in turn brought it to the attention of the court and the State before Harper testified. However, the information at that point had become somewhat garbled, and the allegation was that FBI agents had shown a photograph to Harper. The State had no knowledge of such a showing, and Harper denied recollection of any such event.

"PROSECUTING ATTORNEY: For the record, that is a photograph of Vernon Evans, Junior."

At the suppression hearing, Harper testified concerning the time he was with Evans on April 27th, and he stated that he did not recall making the photographic identification before the grand jury. The trial court, at the conclusion of the hearing, denied the motion to suppress.

### (a)

The defendant's initial contention is that due process required the suppression of Harper's in-court identification on the ground that it was tainted by the allegedly suggestive and unreliable pre-trial identification procedure.

The criteria for determining such a due process claim were developed in *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); and *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). The principles set forth in these cases were recently reviewed and analyzed by Judge Orth for this Court in *Webster v. State*, 299 Md. 581, 599–602, 474 A.2d 1305 (1984).

The initial determination to be made is whether the identification procedure was impermissibly suggestive. It is clear in this case that it was. The showing of a single photograph, under the circumstances shown by this record, was suggestive, and the State does not seriously argue to the contrary. There were no exigent circumstances justifying the presentation of a single photograph rather than an appropriate array.

Therefore, we next consider whether, under the totality of the circumstances, the identification was reliable. The pertinent factors were listed in *Manson v. Braithwaite, supra*, 432 U.S. at 114, 97 S.Ct. at 2253 as follows:

"We therefore conclude that reliability is the linchpin in determining the admissibility of identification testimo-

ny.... The factors to be considered ... include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself."

In the case at bar, Harper was in the immediate presence of the person known to him as "Shorty" for four daylight hours, and viewed him face to face on more than one occasion. His opportunity to view this person was therefore excellent and protracted. It is a fair inference that the degree of attention paid by Harper to "Shorty" was more than casual. They were specifically introduced to one another; they were together for a substantial period of time in a group of only three persons; and the fact that "Shorty" inspected and expressed approval of a machine gun that had been shown to him by Harper's friend could reasonably be expected to focus Harper's attention on this new acquaintance. Harper's description of "Shorty" given to the investigators prior to the photographic identification was unremarkable but accurate. His description was of a short, black male, between 5'4" and 5'5" in height. The record does not reflect any hesitation on the part of Harper in identifying the defendant's photograph.

Considering the totality of circumstances in this case, and balancing the nature and degree of suggestiveness present in the photographic identification against the factors reviewed above, we are not persuaded that there was a substantial likelihood of irreparable misidentification. Rather, we find sufficient evidence that the identification was reliable to make that a question for the jury. The fact that Harper, when he testified at trial some ten months following his grand jury appearance, did not recall having been shown a photograph of the defendant, is consistent with our determination that the impact of the identification

procedure was unlikely to produce an irreparable misidentification.

(b)

As earlier mentioned, defense counsel moved for a mistrial upon learning that there had been a previous photographic identification by Harper. In this Court the defendant contends that he was entitled to a mistrial pursuant to Maryland Rule 4–263, and that he was prejudiced by the denial of the motion. Rule 4–263 provides, in pertinent part, as follows:

> "(a) Without the necessity of a request, the state's attorney shall furnish to the defendant:
>
> \* \* \* \* \* \*
>
> "(2) Any relevant material or information regarding ... pretrial identification of the defendant by a witness for the State.
>
> \* \* \* \* \* \*
>
> "(i) ... If at any time during the proceedings the court finds that a party has failed to comply with this Rule or an order issued pursuant to this Rule, the court may order that party to permit the discovery of the matters not previously disclosed, strike the testimony to which the undisclosed matter relates, grant a reasonable continuance, prohibit the party from introducing in evidence the matter not disclosed, grant a mistrial, or enter any other order appropriate under the circumstances."

We held in *Warrick v. State,* 302 Md. 162, 173, 486 A.2d 189 (1985), that the question of whether any sanction is to be imposed for a discovery violation, and if so what sanction, is in the first instance committed to the discretion of the trial judge, and that the exercise of that discretion includes evaluating whether the violation prejudiced the defendant. Evans argues he has been prejudiced because he would have known of the photographic identification before trial. Specifically, he contends that he would have filed a suppression motion, had more time to prepare for the hearing on

that motion, altered his opening statement, and changed his cross-examination.

The failure of the State to inform the defendant of the photographic identification was a violation of Rule 4–263(a). While the State's failure appears to have been inadvertent, even an unintentional violation of the rule may require the granting of a mistrial if it has irreparably prejudiced a defendant. We are not persuaded, however, that the violation resulted in any prejudice to the defendant Evans, and we conclude that the denial of the motion was an appropriate exercise of the trial judge's discretion. The right to challenge the identification was not lost, because the trial judge entertained defense counsel's motion to suppress, and conducted a full hearing on the motion. The record discloses that all evidence necessary for the proper consideration of the motion was placed before the court, and we perceive no prejudice to the defendant because of the alleged lack of time to prepare for the hearing. We likewise find no merit in the suggestion that defense counsel would have altered his opening statement and his cross-examination of the witness if there had been full compliance with the rule. Defense counsel knew that Harper had identified the defendant as "Shorty" in the federal prosecution, and he had every reason to begin this trial with the belief that Harper would again make that identification. Had he received the discovery information earlier he would have filed a motion to suppress earlier, but the disposition of that motion would have been the same, namely to permit the in-court identification. Thus, the defendant's position would have been no different. With regard to the cross-examination of Harper, the trial judge permitted the defendant to recall Harper for full cross-examination concerning the display of the photograph or any pretrial identification. The defendant also received the benefit of having the judge instruct the jury that Harper was being recalled because subsequent information had been received indicating that Harper "may have testified erroneously or inaccurately."

We perceive no abuse of discretion in the denial of a mistrial.

## II.

The defendant's next arguments relate to the competency of Calvin Harper and Charlene Sparrow to testify at trial.

### (a)

The defendant points to uncontroverted evidence that Harper and Sparrow had previously committed perjury. Therefore, he contends, Harper and Sparrow were disqualified as witnesses, even though neither had been convicted of perjury.[2]

Although the common law principle which disqualified a witness by reason of a conviction of treason, felony, or a crime involving fraud or deceit has been abrogated in the federal courts and in most states,[3] Maryland retains a disqualification for "a person convicted of perjury." Maryland Code (1974, 1984 Repl.Vol.), § 9–104 of the Courts and Judicial Proceedings Article. As the plain language of the statute demonstrates, however, the disqualification occurs only upon *conviction* of perjury.

That a judgment of conviction is necessary before one is disqualified as a perjurer, was recently underscored by this Court in *Myers v. State*, 303 Md. 639, 496 A.2d 312 (1985). In that case, a prosecution witness in a murder trial had, in a prior perjury prosecution, been adjudicated guilty of perjury but had been given probation before judgment. This Court, in an opinion by Judge Cole, held that the person was not disqualified as a witness in the murder trial because § 9–104 of the Courts and Judicial Proceedings Article, as a condition for disqualification, required a "judgment of the court on the verdict and not ... the mere determination of

---

2. Harper admitted to having lied while giving evidence to a grand jury, and Sparrow acknowledged having lied under oath on two previous occasions in related proceedings.

3. *McCormick on Evidence* § 64, at 158 (E. Cleary 3d ed. 1984).

guilt." 303 Md. at 645, 496 A.2d 312. We pointed out that "probation before judgment" is not such a judgment of conviction "unless the person violates the probation order and a court enters a judgment on the finding of guilt." *Id.* [303 Md.] at 648, 496 A.2d 312. As Judge Cole summarized for the Court in *Myers,*

"[W]e conclude that Darlene was not 'convicted' of perjury within the meaning of § 9–104. As such, she was competent to testify at her husband's murder trial. That she had not been satisfactorily discharged from probation at the time of her testimony in this case does not, in our view, materially change this conclusion for the simple reason that the court had not revoked her probation and entered a judgment on the verdict of guilty.

"Despite the above, appellant contends that this holding frustrates the legislature's intent in enacting the disqualification statute for convicted perjurers. We disagree. The General Assembly, as evidenced by its careful use of the dispositive terms associated with this case, obviously was aware that a situation such as this might arise. Had the General Assembly intended to disqualify those found guilty, but not convicted, of perjury, it surely had the ability and knowledge to do so." *Id.* [303 Md.] at 648–649, 496 A.2d 312.

This is dispositive of the defendant's argument in the case at bar. Since Harper and Sparrow had not been convicted of perjury, they were not disqualified. *Accord, Florentine v. State,* 184 Md. 335, 340, 40 A.2d 820 (1945).[4]

---

4. The defendant asserts that the failure of the State to prosecute Harper and Sparrow for perjury constituted misconduct. Of course, as the *Myers* case shows, even if Harper and Sparrow had been prosecuted and had been found guilty, this would not necessarily have resulted in their disqualification. Moreover, we note that generally "whether the State's Attorney does or does not institute a particular prosecution is a matter which rests in his discretion." *Brack v. Wells,* 184 Md. 86, 90, 40 A.2d 319 (1944). *See Food Fair Stores v. Joy,* 283 Md. 205, 213, 389 A.2d 874 (1978); *State's Atty. v. City of Balto.,* 274 Md. 597, 608–609, 337 A.2d 92 (1975), and cases there cited.

(b)

The defendant contends that the trial judge erred in denying his pretrial motion to compel a psychiatric examination of Sparrow, in quashing a subpoena for her attendance and testimony at the hearing on the motion, and in refusing to exclude her testimony at trial. In support of his contention that Sparrow's testimony should be excluded, or that he was entitled to obtain additional information relating to her competence to testify, the defendant made a proffer of facts to the trial judge which we reproduce from the agreed statement of facts:

"Appellant's counsel proffered that Sparrow had given nine separate and inconsistent versions of what had happened. In at least one version (her grand jury testimony) she lied under oath after having been warned of the penalties of perjury. Counsel also proffered that Sparrow tailored her stories to what the police would accept, that they included her own 'inventions' and 'imagination', and that she would 'lie at any time when it would suit [her] purpose.' Counsel also proffered that Sparrow would testify that she was an abused child, that her father had been a child molester, that she had been a prostitute, and that she had used a number of drugs including heroin. She was given total immunity and was being paid $1100 per month as part of a witness protection program."

At the hearing on his motion, the defendant called Dr. Neil Blumberg, a forensic psychiatrist, who offered opinions based upon the proffered evidence. Dr. Blumberg testified that Sparrow might be suffering from a heroin or opioid dependence disorder, an anti-social personality disorder, and/or a borderline personality disorder. He further noted that for a prostitute, central nervous system syphilis "might be an occupational hazard," and that persons so afflicted could suffer damage to the frontal lobes of the brain, which in turn might cause them to be "incapable of perceiving truth, right from wrong." Dr. Blumberg could not state with reasonable medical probability that Sparrow

actually suffered from any of these disorders; he said only that she *might* be so afflicted.

The defendant's pretrial motion for examination and interrogation of Sparrow was denied, but an objection to her testimony was again interposed when she was called as a State's witness at trial. On that occasion, Judge Cathell elected to question the witness out of the hearing of the jury. The following dialogue ensued:

"THE COURT: ... I want to ask you several questions, not about anything specific, about things in general. Do you know you have been sworn, do you not?

"THE WITNESS: Yes.

"THE COURT: You do know that you are under oath do you not?

"THE WITNESS: Yes.

"THE COURT: Do you understand what is meant by telling the truth?

"THE WITNESS: Yes.

"THE COURT: Do you know what is meant by lying?

"THE WITNESS: Not telling the truth.

"THE COURT: Well, what is meant by telling the truth?

"THE WITNESS: Not lying.

"THE COURT: Do you understand that in a proceeding of this type it is exceedingly important that the truth should be told?

"THE WITNESS: Yes.

"THE COURT: Are you at all confused about whether or not it is necessary to tell the truth?

"THE WITNESS: No.

"THE COURT: Is it very clear in your mind that you must under all events tell the truth?

"THE WITNESS: Yes.

"THE COURT: Okay. Does the State care to ask any questions in this area?

"PROSECUTING ATTORNEY: No, Your Honor.

"THE COURT: In this area, only at this time, Mr. Zerwitz, do you care to ask any questions?

"DEFENSE ATTORNEY: You have been advised that prior proceedings when you were under oath that you had to tell the truth, is that correct?

"THE WITNESS: Yes.

"DEFENSE ATTORNEY: You were advised that you had to tell the truth on May 13, 1983 when you had testified in front of the Grand Jury, is that correct?

"THE WITNESS: Yes.

"DEFENSE ATTORNEY: As a matter of fact, you were advised that the penalty for lying would be perjury, ... and you were not granted immunity from that. Did you understand what is meant by perjury?

"THE WITNESS: Yes.

"DEFENSE ATTORNEY: What is perjury?

"THE WITNESS: Lying. Contempt of Court.

"DEFENSE ATTORNEY: Lying to the Court. All right. Or lying before the Grand Jury. Do you understand that to be perjury?

"THE WITNESS: Yes.

"DEFENSE ATTORNEY: Did you, in fact, knowing that, lie to that Grand Jury?

"PROSECUTING ATTORNEY: Objection.

"THE COURT: I will ask the question in that area. If you have previously lied in any proceeding, when you lied, did you know that you lied?

"PROSECUTING ATTORNEY: Objection.

"THE COURT: Answer the question. Objection overruled.

"THE WITNESS: Yes.

"THE COURT: Pardon?

"THE WITNESS: Yes.

"THE COURT: That is all I wanted to know, if she knows when she is telling the truth and she knows when not telling the truth. She is a competent witness.

"PROSECUTING ATTORNEY: Thank you, Your Honor.

"THE COURT: Okay. Gentlemen, I am going to call the jury in now."

Neither counsel sought further preliminary examination of the witness, and she was permitted to testify.

The law of this State concerning competency of a witness suffering mental incapacity is well settled. In *Weeks v. State,* 126 Md. 223, 227, 94 A. 774 (1915), this Court affirmed a ruling that permitted an imbecile to testify, stating:

> "The fact that Carrie Waring was alleged or shown to be an imbecile did not necessarily render her incompetent as a witness. If an imbecile has sufficient understanding to appreciate the nature and obligation of an oath and sufficient capacity to observe and describe correctly the facts in regard to which she is called to testify, there is no reason why her testimony should be excluded...."

In *Johnston v. Frederick,* 140 Md. 272, 281–282, 117 A. 768 (1922), the Court stated:

> "A witness should not be debarred from testifying on the ground of mental incapacity unless the proof of such disqualification is clear and conclusive. The test of incompetency is whether the witness has 'sufficient understanding to appreciate the nature and obligation of an oath and sufficient capacity to observe and describe correctly the facts in regard to which she is called to testify.'
>
> \* \* \* \* \* \*
>
> "The competency of a witness to testify cannot be denied merely because of apprehensions that his testimony may not be truthful. If he is *capable* of appreciating his oath and of testifying correctly, he is not to be rejected altogether because of proof that he might be disposed to disregard that obligation."

*See Terry v. O'Neal,* 194 Md. 680, 688, 72 A.2d 26 (1950); *McCormick on Evidence* § 62, at 156 (3d ed. 1984). *See also Horsey v. State,* 225 Md. 80, 82, 169 A.2d 457 (1961) ("[q]ualification or competency is largely within the discretion of the trial court.")

When a substantial question is presented concerning the competency of a witness, the trial judge should ordinarily conduct a voir dire examination of the witness out of the presence of the jury. Although it is doubtful that any substantial question was presented concerning the competency of Sparrow to testify, as opposed to her willingness to lie when it suited her purposes, Judge Cathell charted a careful course and elected to voir dire the witness. Additionally, a trial judge has the authority to order a mental examination of a witness to assist in the determination of competency when the issue cannot be satisfactorily resolved by reference to existing information and voir dire of the witness. In determining whether a request for a mental examination should be granted, however, a trial judge should carefully balance the demonstrated necessity for a compelled examination against the existence of important countervailing considerations. In affirming the denial of a motion for a psychiatric examination of a government witness, the United States Court of Appeals for the District of Columbia Circuit, in *United States v. Benn*, 476 F.2d 1127, 1131 (D.C.Cir.1972), listed some of the factors to be considered:

> "[A] psychiatric examination may seriously impinge on a witness' right to privacy; the trauma that attends the role of complainant ... is sharply increased by the indignity of a psychiatric examination; the examination itself could serve as a tool of harassment; and the impact of all these considerations may well deter the victim of ... a crime from lodging any complaint at all. Since there is no exact measure for weighing these kinds of dangers against the need for an examination, the decision must be entrusted to the sound discretion of the trial judge in light of the particular facts."

*Accord, United States v. Butler*, 481 F.2d 531 (D.C.Cir. 1973). *See Rasnick v. State*, 7 Md.App. 564, 571–572, 256 A.2d 543 (1969), *cert. denied*, 400 U.S. 835, 91 S.Ct. 70, 27 L.Ed.2d 67 (1970).

It is clear that Judge Cathell understood the applicable law and carefully balanced the need for a psychiatric examination against the relevant factors present in this case. His decision to deny the examination was well within the proper exercise of discretion. It is equally clear that the defendant had no right to insist upon a pretrial deposition or pretrial interrogation of Sparrow, and that the trial judge did not err in quashing the subpoena that would have required her to attend the pretrial hearing.

Moreover, the trial judge was justified in allowing Sparrow to testify. There was evidence that Sparrow had given various inconsistent versions of the relevant facts, had lied under oath, was a prostitute and a user of drugs, had an unfortunate background, and indicated that she would lie when it suited her purposes. At the same time the evidence supported the conclusion that she understood and appreciated the nature of an oath and possessed the capacity to observe and describe correctly the facts about which she was called to testify. The issue was one of credibility, not of admissibility, and the trial judge correctly denied the motion to exclude Sparrow's testimony.

### III.

Claiming that pretrial publicity had deprived him of the opportunity to receive a fair and impartial trial in Worcester County, the defendant filed a suggestion for removal on the day that his trial was scheduled to begin. When that relief was denied, the defendant requested a continuance, and failing that he sought individual voir dire of the prospective jurors and sequestration of the jury throughout the trial. He now contends that the denial of these motions was erroneous.

### (a)

The defendant's suggestion for removal was his second in this case, the first having been filed in December

1983 to remove the case from Baltimore County.[5] The burden was then upon the defendant to demonstrate to the Circuit Court for Worcester County that he could not have a fair and impartial trial in that county or that there was a reasonable ground for believing that he could not receive a fair and impartial trial there. Maryland Constitution, Article IV, § 8(c); *Johnson v. State*, 303 Md. 487, 506, 495 A.2d 1 (1985).

In support of his request for removal the defendant introduced six news articles, the first three from Baltimore City newspapers and the remaining three from Wicomico County newspapers. The first article appeared in *The Evening Sun* on April 26, 1984, and, in addition to providing details of the offense, the article referred to Grandison's trial as well as the defendant's. It recited the previous federal convictions and sentences, detailed the extensive security precautions being taken in connection with Grandison's court appearances, and spoke of earlier threats allegedly made to Cheryl Piechowicz in a courtroom. The second and third articles appeared in *The Sun* and *The Evening Sun*, respectively, on April 27th. The second article did not mention the defendant Evans but referred to the security in Grandison's case, Grandison's previous federal convictions and sentences, and his attempts to interpose the defense of insanity. The third article also referred to the security measures being taken in Grandison's case, repeated the information concerning the federal conviction and sentence of Grandison and Evans, and identified Evans as the alleged "hit man." The fourth and fifth articles appeared in the April 27th edition of *The Daily Times*, published in Wicomico County but enjoying at least limited circulation in

---

**5.** The Maryland Constitution, in Article IV, § 8(b), grants to each party in a death penalty case one absolute right of removal. For a recent comprehensive discussion of Article IV, § 8, *see* Judge Couch's opinion for the Court in *Johnson v. State*, 303 Md. 487, 495 A.2d 1 (1985). In *Johnson* we held, inter alia, that the defendant's automatic right of removal in capital cases can be exercised only once. 303 Md. at 506–508, 495 A.2d 1.

Worcester County. Neither article mentioned Evans. The fourth article included a picture of Grandison in handcuffs, reported the details of the offense, the security in place for the Grandison trial, Grandison's attempt to interpose the defense of insanity, and his previous federal convictions and sentences. The fifth article elaborated on the security precautions being taken in connection with the Grandison trial. The final article appeared in the April 28th issue of *The Daily Times* and briefly sketched the facts of the Grandison case while reporting that no jurors had been selected in that case. Consequently, only two of the six articles mentioned the defendant Evans and reported his prior federal convictions and sentences.

Defense counsel proffered that there had been radio, television and newspaper coverage of the criminal events when they first occurred, and of the subsequent federal prosecution of Evans and Grandison, as well as local television coverage of security measures employed in connection with the Grandison trial. He contended that the citizens of Worcester County would have been exposed to some of this coverage, and this contention was later somewhat confirmed by the responses of a minority of prospective jurors during voir dire questioning.

The record discloses that the trial judge was aware of the earlier publicity concerning the defendant and Grandison, and of the potential for prejudice to the defendant. To abate this possible prejudice he entered a restrictive order curtailing public dissemination of statements concerning the case by the parties, attorneys, witnesses, jurors and police, and he took steps to ensure that necessary security measures would be carried out as inconspicuously as possible. Additionally, there was a careful voir dire of prospective jurors.

We hold that the record supports the decision of the trial judge to deny the request for further removal. We have consistently taken the position that this question is one which rests within the trial court's discretion, reviewable on

appeal only to determine whether there has been an abuse of discretion. *See, e.g., Johnson v. State,* 303 Md. 487, 505–506, 495 A.2d 1 (1985); *Johnson v. State,* 271 Md. 189, 191–192, 315 A.2d 524 (1974); *Seidman v. State,* 230 Md. 305, 324–325, 187 A.2d 109 (1962), *cert. denied,* 374 U.S. 807, 83 S.Ct. 1696, 10 L.Ed. 1031 (1963); *Gray v. State,* 224 Md. 308, 315–316, 167 A.2d 865 (1961); *Piracci v. State,* 207 Md. 499, 508–512, 115 A.2d 262 (1955); *Wanzer v. State,* 202 Md. 601, 607, 97 A.2d 914 (1953); *Downs v. State,* 111 Md. 241, 248–251, 73 A. 893 (1909). The record reveals that the trial judge possessed a complete understanding of the surrounding circumstances and of the applicable law. His conclusion that "the publicity that [had] been brought to the Court's attention would [not] deny us the opportunity to pick a fair and impartial [jury]" was amply supported by the record, and was confirmed by the subsequent voir dire of prospective jurors.

The defendant renewed his request for removal at the conclusion of the voir dire, contending that the loss of those persons excused for cause had altered the composition of the jury pool so that the remaining veniremen did not represent a fair cross-section of the community. The request was again denied. Of the 130 prospective jurors questioned, 50 acknowledged having heard or read something about the case. Of those, 20 were excused for cause by reason of their exposure to pretrial publicity, and an additional six were excused for other reasons. The loss of 20 out of 130 prospective jurors by reason of pretrial publicity did not, in and of itself, indicate that it would be difficult to select a fair and impartial jury from the remaining pool.[6]

The denial of the requests for further removal did not amount to an abuse of discretion under Maryland law.

---

6. The defendant also implied that exclusion of a substantial number of prospective jurors, based in part upon their awareness of current events, might result in fewer well educated jurors. The jury selected in this case consisted of seven college graduates and five high school graduates.

**(b)**

The defendant also asserts that he "was entitled to removal of his case as a matter of [federal] due process regardless of whether it should have been (or could be) removed under state law." (Brief, p. 45). In *Irvin v. Dowd*, 366 U.S. 717, 722–723, 81 S.Ct. 1639, 1642–1643, 6 L.Ed.2d 751 (1961), the Supreme Court said:

> "In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process." ...

\*　　\*　　\*　　\*　　\*　　\*

> "It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."

The Supreme Court also pointed out that where the question of juror partiality was properly raised, an independent evaluation of the voir dire testimony of the impaneled jurors was required. *Irvin v. Dowd, supra*, 366 U.S. at 723, 81 S.Ct. at 1643. We have made such independent examination of the entire voir dire in this case, and we find no error in the conduct of the examination or the decision to deny removal. The defendant was not denied due process of law in the selection of the jury.

(c)

 Similar principles are applicable to the defendant's argument that he was improperly denied a continuance. The determination of whether to grant a continuance lies within the sound discretion of the trial court. *Johnson v. State,* 237 Md. 283, 288, 206 A.2d 138 (1965); *McKenzie v. State,* 236 Md. 597, 601, 204 A.2d 678 (1964); *Schroder v. State,* 206 Md. 261, 265, 111 A.2d 587 (1955). *See,* in addition, the review of cases recently set forth in *State v. Frazier,* 298 Md. 422, 451–452, 470 A.2d 1269 (1984). In *Bryant v. State,* 207 Md. 565, 580, 115 A.2d 502 (1955), the Court stated:

> "As the trial court is in a much better position than the appellate court to determine whether it is proper to continue a case on the ground of public excitement and prejudice, the appellate court will give great weight to the trial court's determination that newspaper publicity of charges against the defendant was not likely to prejudice him at trial."

In the present case, there was no evidence of such pervasive and inflammatory pretrial publicity that would have mandated the granting of a continuance. The trial judge did not abuse his discretion when he denied the motion for a continuance.

(d)

 The defendant contends the trial judge erred in refusing his request for individual voir dire of the jurors. We disagree. In *Colvin v. State,* 299 Md. 88, 102, 472 A.2d 953, *cert. denied,* —— U.S. ——, 105 S.Ct. 226, 83 L.Ed.2d 155 (1984), Judge Couch stated for the Court that "in the absence of a statute or court rule to the contrary, as long as the selection procedure results in a fair and impartial jury, the method and manner of conducting a voir dire rests within the sound discretion of the trial court." *Accord, Poole v. State,* 295 Md. 167, 186–188, 453 A.2d 1218 (1983); *Connor v. State,* 225 Md. 543, 549–550, 171 A.2d 699, *cert. denied,* 368 U.S. 906, 82 S.Ct. 186, 7 L.Ed.2d 100 (1961).

The defendant points to no "specific deficiencies or particular shortcomings in the court's voir dire examination of the prospective jurors" which might have resulted in an unfair and biased jury. *Tichnell v. State,* 297 Md. 432, 468 A.2d 1 (1983), *cert. denied,* — U.S. ——, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984).

As is quite commonly done, Judge Cathell combined techniques of collective and individual voir dire in this case. When general questions could be asked of the venire without danger of prejudice, that procedure was followed. When it appeared that a particular question might produce an answer that should not be heard by other jurors, the answer was received at the bench. The trial judge did not err in denying the defendant's request.

(e)

■ The defendant argues that, in light of the pretrial publicity, the trial judge erroneously denied his motion to have the jury sequestered throughout the trial. Maryland Rule 751 e [7] makes it clear that this decision is within the discretion of the trial judge:

> "The jurors sworn to try a criminal case may, either before or after submission of the case to the jury, in the discretion of the court, be permitted to separate or be kept in the charge of proper officers."

The applicable statute is to the same effect, § 8–304 of the Courts and Judicial Proceedings Article.

Reviewing the circumstances of the pretrial publicity, we find nothing that mandated sequestration of the jury. Nor do we find in the record any evidence of publicity or occurrences during trial that would have compelled sequestration. The trial judge instructed the jury each day concerning exposure to publicity and to comments of others, and the content of these instructions was not challenged by the defendant. Furthermore, the record fails to show a single instance of a violation of the court's instructions or

---

7. Now Maryland Rule 4–311(c).

of potentially prejudicial exposure of any juror to publicity or comment during trial. The defendant has shown no abuse of discretion in the refusal to sequester the jury during trial.

## IV.

■ Next, the defendant contests three evidentiary rulings by the trial court. Two of the rulings concerned the admission of documents under the business records exception to the hearsay rule, Code (1974, 1984 Repl.Vol.), § 10–101 of the Courts and Judicial Proceedings Article, and the third ruling was the admission into evidence of a MAC–11 machine pistol.

### (a)

As earlier discussed, Charlene Sparrow and Janet Moore testified that they had gone to the Baltimore City Jail with the defendant on April 26, 1983, for the purpose of visiting Anthony Grandison. Both stated that Sparrow remained in the car while Moore and the defendant went inside the jail. Moore testified that she had completed a visitor's card required by the jail, signing her name as Janet Grandison and also writing the defendant's name on the card, misspelling it as "Vernoned Evans." She identified State's exhibit 18 as the visitor's card which she had signed. Captain James L. Drewery testified that he was in charge of the department that controlled visits at the Baltimore City Jail. He identified State's exhibit 18 as a visitor's card required to be completed, and kept in the regular course of business of the jail. Captain Drewery explained that jail personnel enter the name of the prisoner to be visited and the date, and then hand the card to the visitor, who enters the name of those visiting and their relationship to the prisoner. This card serves as a pass when a visitor moves through various checkpoints, but it must be surrendered to the jail authorities when the visit takes place. Information from the card is normally then entered into a computer for

statistical purposes, but Captain Drewery indicated that this was not always done because of personnel shortages.

Charlene Sparrow testified that she had attempted to rent a room at the Warren House Hotel on April 26th, but could not because of the lack of a reservation and the unavailability of rooms. She had left her name, however, and was able to rent a room on April 27th. She testified that she had signed a hotel registration form and had been given Room 222, which she occupied until April 29th. She identified State's exhibit 10 as the registration form, and identified her name and address as having been written by her.[8] Luther Pugh, night auditor and desk clerk at the Warren House Hotel, identified State's exhibit 10 as a record required to be kept in the regular course of business of the hotel. He testified that his handwriting appeared in the top portion of the form, and he identified the room as number 222, the guest as "Sparrow, C." and the check-in and check-out dates as April 27th and April 29th, respectively. He explained that the guest normally enters his or her name and address on the next portion of the card, and that the final portion consists of charge entries made from the cash register. Pugh also confirmed that a black female had attempted to rent a room on April 26th, and, being unable to do so had left her name and returned to rent a room on the following day.

The defendant mounts a single attack upon the admission of the jail visitor's card and the hotel registration form. He contends that they were not admissible under the business records statute because they were made by Janet Moore and Charlene Sparrow instead of by custodians under a duty to make truthful reports. The defendant thus argues (Brief, pp. 49–50):

"The rationale of the business records exception is that the writer is under a duty to make a truthful report. *Aetna Casualty and Surety Co. v. Kuhl*, 296 Md. 446,

---

8. Sparrow stated that she had entered her sister's address because she did not want to give her own.

454, 463 A.2d 822 (1983). In this case the record was not made by any official under any duty to make a truthful report. The writer was in fact Janet Moore....

\*　　\*　　\*　　\*　　\*　　\*

"Section 10–101(c) of the Courts article provides that the 'practice of *the business* must be to make such written records of *its acts* at the time they are done or within a reasonable time afterwards.' The 'business' concerned, the prison, did not make the record nor did the record concern prison officials' acts. Rather it concerned the acts of visitors to the jail under no duty to be truthful. Thus, the record did not fall within the business records exception. The record was used to bolster testimony by State's witnesses about Appellant's and Moore's visit to Grandison, an important part of the State's case. Thus, the admission of the record was prejudicial error.

"The trial court also admitted into evidence the guest register of the Warren House. It was admitted to show that Charlene Sparrow had registered as a guest. Guests, however, are under no duty to make a truthful report, and it was not the practice of the Warren House to check the identity of its guests. Thus, all of the necessary criteria for admission was absent."

The business records statute, § 10–101 of the Courts and Judicial Proceedings Article, provides in relevant part as follows:

"(b) *Admissibility.*—A writing or record made in the regular course of business as a memorandum or record of an act, transaction, occurrence, or event is admissible to prove the act, transaction, occurrence, or event.

"(c) *Time of making records.*—The practice of the business must be to make such written records of its acts at the time they are done or within a reasonable time afterwards.

"(d) *Lack of knowledge of maker.*—The lack of personal knowledge of the maker of the written notice may be

shown to affect the weight of the evidence but not its admissibility."

Each document was clearly a record made in the regular course of business within the contemplation of the above-quoted statutory language. *See Wilson v. State,* 44 Md. App. 318, 333–334, 408 A.2d 1058 (1979). We see no practical difference between a jailor asking the name of a visitor and entering it as given, and asking the visitor to enter the information. A visitor wishing to give incorrect information may do so as well verbally as in writing, and there is no enhanced reliability in having the jailor enter this information. The same reasoning applies to the hotel registration form, although we observe that, apparently because of the previous day's reservation, the information identifying Sparrow as the person renting the room appears on the form in the hand of the clerk as well as that of Sparrow. As the statute makes clear, any lack of personal knowledge by the jailor or clerk concerning the information goes to the weight of the evidence but not its admissibility. Furthermore, both Moore and Sparrow were available for cross-examination.

We also note that the card and registration form were not offered as independent substantive evidence of the fact that Moore and Evans were at the Baltimore City Jail on April 26th, or that Sparrow registered at the Warren House Hotel on April 27th. The visitor's card was offered to corroborate the testimony of Sparrow and Moore that Grandison was visited on April 26th by two people, and to corroborate the testimony of Moore that she was present at the jail on April 26th and made the particular entries on a visitor's card bearing the name of Grandison. Similarly, the hotel registration form was offered to corroborate the testimony of Sparrow that she had registered at the Warren House Hotel on April 27th and signed a registration form on that date. *See Morrow v. State,* 190 Md. 559, 562, 59 A.2d 325 (1948); *Thomas v. Owens,* 28 Md.App. 442, 346 A.2d 662 (1975).

(b)

 The defendant maintains that the trial judge erred in admitting into evidence a MAC–11 machine pistol as a weapon representative of that allegedly used in the slaying. Although the weapon actually used was not recovered, the State produced evidence from which the trial judge could have concluded that the weapon used was quite likely, if not almost certainly, a MAC–11 machine pistol. Agent Robert W. Sibert of the Federal Bureau of Investigation was qualified as a firearms identification expert. He testified that, from his examination of the expended bullets and fired cartridge cases removed from the scene of the crime or the bodies of the victims, all were fired from the same weapon, and that in his opinion the weapon used was a MAC–11 machine pistol. Agent Sibert could not exclude the possibility that somewhere in the world someone had manufactured a weapon that would duplicate the identifiable characteristics found on the bullets and casings. Nevertheless, he did testify that no other weapon known to him, either through his personal knowledge or through information gained from a computer search of the extensive data accumulated and stored by the Federal Bureau of Investigation relating to the characteristics of all known weapons, could have fired the bullets and casings examined by him.[9]

Concerning the admissibility of representative or duplicate exhibits, the following passage from *McCormick on Evidence* § 213, at 670 (3d ed.1984) is apposite:

"Illustrative exhibits may often properly and satisfactorily be used in lieu of real evidence. As previously noted, articles actually involved in a transaction or occurrence

---

**9.** Initial examination of the casings and bullets disclosed that they were .380 auto caliber. Examination of the land and groove markings etched onto the bullets when fired, and comparison with the land and groove characteristics of every other known weapon that is capable of firing .380 auto caliber ammunition narrowed the search to 11 possible weapons. Comparison of marks found on the shell casings with marks known to be made by the extractor, firing and ejector mechanisms of those weapons excluded all other than the MAC–11 machine pistol.

may have become lost or be unavailable, or witnesses may be unable to testify that the article present in court is the identical one they have previously observed. Where only the generic characteristics of the item are significant no objection would appear to exist to the introduction of a substantially similar 'duplicate.' While the matter is generally viewed as within the discretion of the trial court, it has been suggested that it would constitute reversible error to exclude a duplicate testified to be identical to the object involved in the occurrence...."

*See United States v. Cunningham,* 423 F.2d 1269, 1276 (4th Cir.1970). The relevance and materiality of the proffered exhibit, and the desirability of having a representative weapon rather than a photograph, were apparent. The State offered the testimony of Calvin Harper to show that one day before the shooting Evans had been shown a "machine gun" by Rodney Kelly, and that Evans had examined the weapon, saying that "he liked it" when told by Kelly that it was "what he needed." Tying the weapon offered to Evans, one day before the shooting, to the weapon used in the shooting, was clearly an important part of the State's case. Moreover, identification could more accurately be made by examination of a representative weapon than by examination of a photograph.

The trial judge was required to weigh the probative value of the proffered exhibit against any improper prejudicial effect it might have had on the jury. We cannot conclude that the balance struck was an abuse of discretion.

## V.

On constitutional grounds the defendant advances two separate arguments that the jury was improperly selected. First, he argues that the exclusion from the venire of persons who would never vote to impose capital punishment resulted in the selection of a jury constitutionally infirm for the function of adjudicating guilt or innocence. Second, he

contends that the prosecution's use of peremptory challenges to exclude blacks from the jury was improper.

(a)

■■ During the jury selection, those prospective jurors who indicated that they were opposed to the death penalty but that they could vote to impose it under certain circumstances were not excused for cause. On the other hand, those prospective jurors who stated that they would be unable to return a death sentence under any circumstances were excused for cause. Citing various studies, the defendant asserts that the exclusion for cause of the latter group of prospective jurors, from the guilt or innocence phase of the proceedings, resulted in a "conviction prone" jury. He argues that such a jury "is therefore not impartial on the question of guilt or innocence," that it deprives him of "his right to a jury drawn from a fair cross-section of the community," that it constitutes a denial of equal protection, and that it causes the proper functioning of the jury to be impaired. (Brief, p. 53).

The defendant's argument is the same as the argument made and rejected in *Foster v. State*, 304 Md. 297, 498 A.2d 1184 (1985), which we have filed today. For the reasons set forth in Part I B of the *Foster* opinion, 304 Md. at 453, 457–466, 499 A.2d at 1243, 1245–1250, we again reject this argument.

(b)

■■ At the conclusion of the exercise of peremptory challenges for the selection of the first twelve jurors, and before any juror was sworn or the alternates selected, defense counsel charged that the prosecutor had improperly exercised his peremptory challenges to strike black prospective jurors. The relevant part of the trial transcript is as follows:

"THE COURT: ... The Jury, as it is presently constituted, is it acceptable to the Defendant?

"DEFENSE ATTORNEY: Your Honor, may we approach the bench?

"THE COURT: You may. The record will reflect the Defendant is invited to the bench.

"(Whereupon, Counsel and the Defendant approached the bench and the following proceedings were held out of the hearing of the jury.)

"DEFENSE ATTORNEY: Your Honor, if Your Honor please, the panel is not acceptable to the Defendant as seated for the following reasons: One, that the State has exercised its peremptory challenges to purposely limit blacks from representation on the panel. The State struck eight of ten prospective black jurors utilizing their peremptory challenges.

"THE COURT: I counted seven. I listed the names of seven.

"DEFENSE ATTORNEY: I had ten, Your Honor.

"PROSECUTING ATTORNEY: The State doesn't know.

"THE COURT: The State had ten strikes.

"DEFENSE ATTORNEY: The State had ten strikes and used eight. They used eight. There were ten.

"THE COURT: I recall them striking seven blacks. I may be wrong by one.

"DEFENSE ATTORNEY: Okay.

"THE COURT: Assuming your figures are correct, I will hear you.

"DEFENSE ATTORNEY: I submit to the Court there were ten blacks presented to the jury panel and the State utilized its peremptory challenges to strike eight of those ten, leaving two blacks on the jury panel. I believe that the State did so in a manner to limit the black representation on the panel. I believe the State exercised its peremptory challenges in a totally racially motivated manner, and therefore, this panel certainly does not represent an adequate cross-section.

"Based on that, Your Honor, the panel is not acceptable.

* * * * * *

"THE COURT: Do you care to be heard on his objections raised to the panel by Defense Counsel?

"PROSECUTING ATTORNEY: Yes, Your Honor. I don't know how many black people we struck. I didn't keep track of whether we were striking black people or white people. We struck on background, age, occupation, what was learned during the voir dire at the bench and in open court. We did not strike on racial grounds.

"I am looking now at the jury and I see that there are two black jury persons on this jury. And I also note I am sure I struck some white people. I don't know. I am sure I struck some white people.

"DEFENSE ATTORNEY: Two.

"THE COURT: As to who is counting, it's two or three.

"PROSECUTING ATTORNEY: That's news to me. I didn't keep track. I wasn't striking on racial grounds.

"DEFENSE ATTORNEY: On that issue, may we make a proffer to the Court?

"DEFENSE ATTORNEY: The peremptories exercised by the State—

"THE COURT: The peremptories exercised by the State, according to my records, were Polla Bagwell, the lady in the red back here; Eliven F. Johnson, Jr.—

"DEFENSE ATTORNEY: Yes.

"THE COURT: —Norma Allen—Norma Anna Allen.

"DEFENSE ATTORNEY: Excuse me, Your Honor. There was also Charles S. Dennis.

"THE COURT: I'm sorry, that's right. You are correct. There were eight. I did not have Mr. Dennis down here.

"DEFENSE ATTORNEY: That makes eight.

"THE COURT: Eight blacks. We are in agreement. Very good. I'm sorry, I didn't have him down.

"DEFENSE ATTORNEY: Now, the record is clear.

"THE COURT: Your objections are noted for the record. Your objections are overruled. . . ."

The defendant's argument must fail if the holding of *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d

759 (1965), is controlling. In *Swain* the Supreme Court, after reviewing the nature of peremptory challenges, said (380 U.S. at 221–222, 85 S.Ct. at 836–37):

"[W]e cannot hold that the striking of Negroes in a particular case is a denial of equal protection of the laws. In the quest for an impartial and qualified jury, Negro and white, Protestant and Catholic, are alike subject to being challenged without cause. To subject the prosecutor's challenge in any particular case to the demands and traditional standards of the Equal Protection Clause would entail a radical change in the nature and operation of the challenge. The challenge, *pro tanto*, would no longer be peremptory, each and every challenge being open to examination, either at the time of the challenge or at a hearing afterwards. The prosecutor's judgment underlying each challenge would be subject to scrutiny for reasonableness and sincerity...." [10]

The defendant argues, with considerable force, that *Swain* is no longer controlling. He points out that *Swain* was decided only on equal protection grounds, and that three years following the decision in that case the Supreme Court ruled in *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), that the Sixth Amendment guarantee of trial "by an impartial jury" was applicable to the states. He relies on *McCray v. New York*, 461 U.S. 961, 103 S.Ct. 2438, 77 L.Ed.2d 1322 (1983), where five Justices of the Supreme Court indicated that the time may be approaching for a re-examination of the holding in *Swain*. The defendant cites state cases which have held

---

**10.** *Swain* did hold that proof of the use of peremptory challenges to bring about systematic exclusion of blacks from criminal juries over a period of time, sufficient to demonstrate that "the State has not seen fit to leave a single Negro on any jury in a criminal case," might overcome the presumption protecting the prosecutor and permit a finding that the "purposes of the peremptory challenge are being perverted" in violation of the Fourteenth Amendment. *Swain, supra,* 380 U.S. at 224, 85 S.Ct. at 838. In the instant case there is no claim or evidence of a systematic exclusion of blacks from criminal juries in Worcester County.

that the use of peremptory challenges by a prosecutor to exclude all blacks from a single jury solely because of race violates state constitutional provisions. *People v. Wheeler*, 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (1978); *State v. Neil*, 457 So.2d 481 (Fla.1984); *Commonwealth v. Soares*, 377 Mass. 461, 387 N.E.2d 499, *cert. denied*, 444 U.S. 881, 100 S.Ct. 170, 62 L.Ed.2d 110 (1979). *See State v. Crespin*, 94 N.M. 486, 612 P.2d 716 (N.M.Ct.App.1980). Finally, the defendant points to the decisión of the United States Court of Appeals for the Second Circuit in *McCray v. Abrams*, 750 F.2d 1113, 1131 (2d Cir.1984), holding that the Sixth Amendment forbids the exercise of peremptory challenges by the prosecution to exclude jurors solely on the basis of their racial affiliation.

This Court considered but did not rule upon a similar argument in *Lawrence v. State*, 295 Md. 557, 457 A.2d 1127 (1983). We concluded that the evidence in that case was insufficient to overcome the presumption that the prosecutor had exercised his peremptory challenges in a constitutional manner.

As in *Lawrence*, we need not here decide whether to follow the approach suggested by *Wheeler, Soares,* and related state cases, or the approach suggested by *McCray v. Abrams, supra,* for the record in this case does not support the defendant's assertion of error under the test established by either line of cases. The tests suggested by each leading case are similar. Each starts with the presumption established by *Swain,* that the prosecution is using the State's challenges properly. Each then requires the defendant to establish a prima facie case of discrimination sufficient to overcome the presumption, followed by an opportunity for explanation on the part of the prosecution if a prima facie case is made out, with the ultimate resolution of any dispute to be made by the trial judge.

To establish a prima facie case, *Wheeler* requires the defendant to show (1) "that the persons excluded are members of a cognizable group within the meaning of the

representative cross-section rule ... [and (2) that] from all the circumstances of the case there exists a strong likelihood that such persons are being challenged because of their group association rather than because of any specific bias." *People v. Wheeler, supra,* 583 P.2d at 764. *Soares* requires a showing that "(1) a pattern of conduct has developed whereby several prospective jurors who have been challenged peremptorily are members of a discrete group, and (2) there is a likelihood they are being excluded from the jury solely by reason of their group membership." *Commonwealth v. Soares, supra,* 387 N.E.2d at 517. *McCray* requires a showing that "(1) the group alleged to be excluded is a cognizable group in the community, and (2) there is a substantial likelihood that the challenges leading to this exclusion have been made on the basis of the individual venireman's group affiliation rather than because of any indication of a possible inability to decide the case on the basis of the evidence presented." *McCray v. Abrams, supra,* 750 F.2d at 1131–1132. If a prima facie case is made out, the burden shifts to the State. The court in *McCray* explained (*id.* at 1132):

"In order to rebut the defendant's showing, the prosecutor need not show a reason rising to the level of cause. There are any number of bases on which a party may believe, not unreasonably, that a prospective juror may have some slight bias that would not support a challenge for cause but that would make excusing him or her desirable. Such reasons, if they appear to be genuine, should be accepted by the court, which will bear the responsibility of assessing the genuineness of the prosecutor's response and of being alert to reasons that are pretextual. *See, e.g., People v. Hall,* 35 Cal.3d 161, 197 Cal.Rptr. 71, 75, 672 P.2d 854, 858 (1983) (*en banc*) (reasons proffered by prosecutor for peremptorily excusing blacks were equally applicable to whites not excused; *held,* defendant's prima facie showing not rebutted). If the court determines that the prosecution's presentation is inadequate to rebut the defendant's proof, the court

should declare a mistrial and a new jury should be selected from a new panel."

In the present case, a black defendant was on trial for the alleged murder of two white persons, and the defendant was able to show that the prosecution used eight of its ten peremptory challenges to exclude blacks. We shall assume arguendo that this showing was sufficient to establish a prima facie violation of the defendant's rights. Nevertheless, we conclude that the explanation offered by the prosecutor, and apparently accepted by the court, was sufficient under the circumstances to support the decision of the trial judge in overruling the defendant's objection. The prosecution in this case had declined to exercise peremptory challenges against two blacks who were impaneled and instead used its two remaining challenges to exclude whites. It is also significant that neither the judge nor defense counsel questioned the explanation of the prosecutor or requested further particulars. This may well have represented a tactical decision by the defendant's counsel, to require the court's decision to be made upon the weighing of the defendant's prima facie showing against the rather general response of the prosecutor, as opposed to seeking specific information from the prosecutor as to each excused venireman and running the risk of further strengthening the prosecutor's explanation. For whatever reason, the explanation of the prosecutor stood uncontroverted and unimpeached. As we have indicated, it was sufficient to support the decision reached by the trial judge.

## VI.

The defendant's final challenge to the verdicts at the guilt or innocence phase of the proceedings is his contention that the instant prosecution was barred by double jeopardy principles. Asserting that the federal and state prosecutions were for the same offenses, the defendant insists that such multiple trials, convictions and sentences for "the same offenses" violate "[b]oth constitutional provisions and fundamental fairness" (Brief, p. 71). We rejected the iden-

tical argument in the defendant's prior appeal, *Evans v. State, supra,* 301 Md. 45, 481 A.2d 1135, and the majority of the Court adheres to the views set forth in that opinion.

## VII.

Turning to the sentencing hearing, the defendant initially complains that evidence concerning a minimum parole release date was improperly excluded. He proffered the testimony of William J. Kunkel, Chairman of the Maryland Parole Commission, to prove that if he were given a consecutive life sentence for each murder in addition to a consecutive life sentence for conspiracy to murder and a 20-year consecutive sentence for the handgun offense, under current law and Parole Commission guidelines, he would be eligible for consideration for parole only after serving 39½ years. Additionally, Mr. Kunkel would have testified that if these sentences were made consecutive to the previously imposed federal sentence of life plus 10 years, computation of the 39½ years would not begin until the defendant was paroled by federal officials. Mr. Kunkel would also have explained that because of the imposition of life sentences the Commission could only recommend parole, and that the final decision as to whether parole would be granted lay with the Governor.

In *Poole v. State,* 295 Md. 167, 196, 453 A.2d 1218 (1983), this Court flatly took the position that, at a capital sentencing hearing, "reference to the possibility of future parole was improper and, upon remand, should not again be made." Judge Couch for the Court pointed out that such reference "is likely to allow the jury to disregard its duty to determine aggravating and mitigating factors, and then balance one against the other as required by [the statute].... Any consideration of the possibility of parole as such simply is irrelevant...." 295 Md. at 197, 453 A.2d 1218. We also quoted with approval the reasoning of Chief Judge Brune for the Court in *Shoemaker v. State,* 228 Md. 462, 469, 180 A.2d 682 (1962), as follows:

" 'The chief vice of the reference in this case to the possibility of parole is that it suggested to the jury that it might in part shift its responsibility for a finding of the defendant's guilt to some other body.' " 295 Md. at 196, 453 A.2d 1218.

More recently, in *Johnson v. State, supra,* 303 Md. at 516, 495 A.2d 1, we reiterated that reference to parole in a capital sentencing hearing is "improper."

The defendant argues that the proffered evidence was relevant to the statutory mitigating circumstance [11] " 'dealing with the unlikelihood of further criminal activity that would constitute a continuing threat to society.' " (Brief, p. 72). Such evidence offered by a defendant concerning the possibility of parole is no more relevant to this mitigating circumstance than the reference and argument by the prosecution in *Poole* and *Johnson.* In this connection, it should be pointed out that one might be likely to engage in criminal activity constituting a threat to those around him whether he is confined in a penal institution or is on parole.[12]

The *Poole* and *Johnson* cases are dispositive of the defendant's argument and required the trial judge in the instant case to exclude the proffered testimony.

## VIII.

 The Maryland death penalty statute lists as a mitigating circumstance to be considered by the sentencing authority that "[t]he act of the defendant was not the sole proximate cause of the victim's death." Art. 27, § 413(g)(6). The defendant requested that the jurors be instructed that they must find this mitigating circumstance

---

**11.** Art. 27, § 413(g)(7).

**12.** *See, e.g., Thomas v. State,* 301 Md. 294, 348 (concurring and dissenting opinion), 483 A.2d 6 (1984), *cert. denied,* — U.S. —, 105 S.Ct. 1856, 85 L.Ed.2d 153 (1985), where the expert testimony, concerning criminal activity constituting future danger to society, related to what might happen in prison, with the expert saying with regard to the defendant, "I wouldn't want to be his cell mate."

if they found as an aggravating circumstance that these were contract murders.[13] The defendant reasoned that, if the jury found that Grandison had hired him to kill the victims, then Grandison's action was, as a matter of law, a proximate cause of the death of the victims, and that the defendant's conduct could not have been the sole proximate cause. The trial judge denied the request, reasoning as follows:

> "[T]he proximate cause that I read in the Statute is that it was, whatever this Defendant did, was the sole proximate cause of the death of the individuals, as it relates to death, not in the planning of the occurrence. And there is absolutely no evidence to indicate that from the time Vernon Evans pulled the trigger on this machine gun, and Susan Kennedy and David Piechowicz died, that anything else from anyone happened that caused those deaths, other than the particular bullet wounds. And I think proximate cause as mentioned in the Statute relates to proximate cause of the death, not related to planning of a week before, or two weeks before in some, and perhaps longer before. I think it relates solely to the death of the victims."

The defendant argues in this Court that the ruling constituted reversible error.

The resolution of this question depends upon the meaning of the words "proximate cause" intended by the Legislature in the context of this statute. The word "cause," standing alone, generally refers to the actual cause of an event, often referred to as "causation in fact," and if unrestrained by legal qualifications may embrace an almost endless number of antecedent factors. *See* R. Perkins, *Criminal Law* 771 (3d ed.1982):

---

**13.** Art. 27, § 413(d)(6), lists as an aggravating circumstance that "[t]he defendant committed the murder pursuant to an agreement or contract for remuneration or the promise of remuneration to commit the murder."

"In homicide by shooting, for example, while the mind turns first to the man who pulled the trigger, it was obviously impossible for him to have committed that homicide (by shooting) without a loaded weapon. As he did not, in all probability, make the gun himself, it is necessary to consider others, such as those who made and sold the weapon, and even the inventor of that particular kind of firearm. Others perhaps were connected with the result because they made the shell or the bullet or the powder, or assembled the finished cartridge. The mind gets lost in the labyrinth of contributory factors long before the possibilities are exhausted...."

See also *Peterson v. Underwood*, 258 Md. 9, 16–17, 264 A.2d 851 (1970).

The addition of the modifier "proximate" to the word "cause" limits the number of actual causes for which liability may be imposed to those having a nexus to the event sufficient to satisfy the societal concept of fairness.[14] Precisely what will constitute "proximate cause" may vary according to the nature of the case (R. Perkins, *Criminal Law, supra,* at 776.

"The line of demarcation between causes which will be recognized as proximate and those which will be disregarded as remote 'is really a flexible line.' 'Legal causation reaches further' in some types of cases than it does in others. It reaches further in tort actions based upon intentional harm than in those resulting from negligence, and neither of the boundaries so established is necessarily controlling in other types of cases, such as

---

**14.** Commenting on the choice of this word, Professor Prosser said (W. Prosser, *The Law of Torts* § 42, at 273 (5th ed. 1984)):

"The word 'proximate' is a legacy from Lord Chancellor Bacon, who in his time committed other sins. . The word means nothing more than near or immediate; and when it was first taken up by the courts it had connotations of proximity in time and space which have long since disappeared. It is an unfortunate word, which places an entirely wrong emphasis upon the factor of physical or mechanical closeness. For this reason 'legal cause' or perhaps even 'responsible cause' would be a more appropriate term."

actions for breach of contract, those under Workmen's Compensation Acts, or criminal prosecutions."

*And see Campbell v. State,* 293 Md. 438, 451, 444 A.2d 1034 (1982), where we stated:

"Because of the extreme penalty attaching to a conviction of felony murder, a closer and more direct causal connection between the felony and the killing is required than the causal connection ordinarily required under the tort concept of proximate cause."

We have thus far analyzed the meaning of the term "proximate cause" in the context of its utilization to describe the nexus that the law will require to support the imposition of liability in a particular case. If it were our task to determine whether there is a nexus between (a) the act of procuring for hire the murder of another, and (b) the actual murder of that person, sufficient to support a verdict of murder in the first degree and the imposition of the sanction of death, we would conclude that there is. At common law one who procured another to commit murder could be convicted as an accessory before the fact and suffer the same punishment as the perpetrator, and today Maryland law permits an accessory before the fact to murder to be indicted and convicted of murder in the first degree. *State v. Williamson,* 282 Md. 100, 382 A.2d 588 (1978). Moreover, the Legislature has authorized imposition of the death penalty for one who procured the murder of another for remuneration or the promise of remuneration,[15] thus finding as a matter of policy a sufficient nexus between the act and the result to justify the imposition of the ultimate sanction. Therefore, using the term "proximate cause" in this context, and ascribing to it the legal meaning developed for such use, we would conclude that the act of hiring another to commit murder is a proximate cause of that murder.

---

**15.** Art. 27, § 413(d)(7) and (e)(1).

This does not conclude our inquiry, however, because the Legislature clearly did not use the term in its ordinary context. Rather than being concerned with the fairness of holding one responsible for a murder committed by another outside of his presence, the Legislature was here concerned with the fairness of allowing a defendant to show that his act alone did not cause the death of the victim. It was concerned with another cause which reasonably could be considered "mitigating." Viewed in the particular context in which the words are used, we conclude that the General Assembly intended the words "proximate cause" to apply only to direct physical causes of the victim's death, and not to acts of a principal in the second degree or an accessory before the fact which aided or abetted the act directly causing death. Under the ordinary meaning of the word "mitigating," there is nothing mitigating about a murder because it was done pursuant to a contract.

If the defendant's interpretation of the statutory language is correct, the assassin is entitled to consideration with respect to sentence whenever it is shown that some other person participated as an accessory before the fact or as a principal in the second degree. It is difficult to understand the logic in such proposition. It is more reasonable to suggest that one may be entitled to sentencing consideration by showing that he alone was not the sole direct physical cause of the death of the victim.[16] Conse-

---

**16.** The type of situation which the Legislature likely had in mind by the language of § 413(g)(6) is illustrated by the following. If the perpetrator inflicts a serious wound under circumstances that would justify a conviction for murder if death should ensue, and death does ensue partly by reason of negligent medical treatment or refusal of the victim to accept medically recommended care, the perpetrator will not be excused from liability for the murder. *See De Vaughn v. State*, 232 Md. 447, 194 A.2d 109 (1963), *cert. denied*, 376 U.S. 927, 84 S.Ct. 693, 11 L.Ed.2d 623 (1964). Nevertheless, in a capital punishment case there would exist as a mitigating factor an additional proximate cause of death.

We need not in this case, however, explore the range or scope of acts which might fall within the language of § 413(g)(6). We go no further than our holding that the act of a principal in the second

quently, the defendant was not entitled to the requested instruction.[17]

## IX.

The defendant contends the trial judge erred in refusing to add to his instructions a statement that mitigating factors found by the jury in addition to those specifically set forth in the statute "can be given as much weight as [statutory] mitigating factors, and it is up to the jury to determine the weight to be given them." While this proposed instruction properly stated the law, the judge was not obligated to grant it if the matter was fairly covered by the instructions actually given. *England and Edwards v. State*, 274 Md. 264, 274–276, 334 A.2d 98 (1975).

The trial judge instructed the jurors concerning their consideration of mitigating circumstances by following closely the wording of the statute. After enjoining the jurors to "consider whether, based upon a preponderance of the evidence, any of the following mitigating circumstances exists," he read or closely paraphrased each numbered paragraph of Art. 27, § 413(g), concluding with:

> "(8) Any other facts which the jury specifically sets forth in writing that it finds as mitigating circumstances in the case."

The judge also referred the jurors to the sentencing determination forms that were before them, and on these forms the mitigating circumstances were listed in eight numbered paragraphs that track the words of the statute. The eighth numbered paragraph provides:

---

degree or accessory before the fact is not what the Legislature had in mind.

17. Of course, our rejection of the defendant's construction of § 413(g)(6) would not preclude a capital murder defendant, who was the first degree principal in a contract murder case, from arguing to the jury that the role of the accessory constituted a mitigating circumstance under § 413(g)(8). *See Foster v. State, supra,* 304 Md. at 474, 499 A.2d at 1254.

"8. Other mitigating circumstances exist, as set forth below:

$$\overline{\text{Yes}} \quad \overline{\text{No}} \quad "$$

The message clearly conveyed by the instructions given was that *all* mitigating circumstances were entitled to equal consideration. Nothing in the instructions remotely inferred that other mitigating circumstances found by the jurors were entitled to less weight than those specifically set forth in the statute. Additionally, the trial judge instructed the jurors as follows:

"[I]t is important that you remember that you are engaged in more than a mere counting of aggravating and mitigating circumstances. It is your duty to weigh each of those factors, both aggravating and mitigating, to determine whether the sentence shall be life or death."

There was no error in refusing the requested instruction.

## X.

The defendant next argues that the Maryland capital punishment statute is unconstitutional. This argument is identical, virtually word for word, with the argument made in *Foster v. State, supra,* filed today. As in the *Foster* case, the defendant does not in this Court challenge any instruction given by the trial judge, does not complain of a refusal to give a requested instruction, and does not complain of the sentencing form used by the jury. Instead, the attack is upon the language of the statute itself. For the reasons set forth in Part IV of the *Foster* opinion, we reject the defendant's argument.[18]

---

**18.** Although, as pointed out above, the defendant Evans does not in this Court complain of any instruction given, he did in the trial court interpose an objection to an instruction. In connection with instructing the jury on the weighing of aggravating and mitigating circumstances, the trial judge at one point utilized verbatim the language of Art. 27, § 413(h). Defense counsel objected to the instruction on the ground that the language unconstitutionally placed the burden of proof upon the defendant. The objection was overruled.

As the defendant in this Court raises no issue concerning the instruction given, the matter is waived. *Ricker v. Abrams,* 263 Md.

## XI.

██ The defendant argues that the trial judge's jury instructions, dealing with the concept of proof beyond a reasonable doubt, were deficient for failure to include the words "and to a moral certainty" after the words "beyond a reasonable doubt." He contends that because the words had been used to explain the burden that was upon the State at the guilt/innocence stage of the trial, failure to use the same words would convey the impression that a lesser burden was imposed upon the State at the penalty stage.

The record does not support this contention. In giving his instructions to the jury at the conclusion of the penalty stage, Judge Cathell said:

"In determining the sentence in this case, you shall first determine whether, beyond a reasonable doubt *and to a moral certainty*, the State has proven that the Defendant was a principal in the first degree." (Emphasis added.)

Three paragraphs later he defined reasonable doubt as follows:

"A reasonable doubt is a doubt founded upon reason. It is not a fanciful doubt, or a whimsical or capricious doubt. It is such a doubt as would cause a reasonable person to hesitate to act in the gravest or more important transactions of life. Thus, if the evidence is of such a character as to persuade you that the Defendant was a principal in the first degree with the same force that would be sufficient to persuade you to act without hesitation upon the abiding conviction of truth in the gravest

---

509, 516, 283 A.2d 583 (1971); *Harmon v. State Roads Comm.,* 242 Md. 24, 30–32, 217 A.2d 513 (1966).

Moreover, even if the objection to the instruction had not been waived, we held in *Foster,* 304 Md. at 479, 499 A.2d at 1256–1257, that the language of § 413(h) does not place any burden or risk upon the accused. If a defendant requests an explicit instruction dealing with the burden of persuasion under § 413(h), in accordance with the discussion in Part IV(c) of *Foster,* a trial judge should give such instruction. There was, however, no such request in this case.

or most important transactions of your own life, you may conclude that the State has met its burden of proof beyond a reasonable doubt *and to a moral certainty."* (Emphasis added.)

Very shortly thereafter (the following page in the transcript) The trial judge instructed the jury that "you shall first consider whether, beyond a reasonable doubt, the following aggravating circumstances exist. . . ." After then reading the sixth and ninth aggravating circumstances, he said that "reasonable doubt has been defined for you in discussing principals in the first degree."

Assuming (without in any manner intimating) that it was necessary to define reasonable doubt in terms of "moral certainty" to avoid any possibility of misunderstanding, it is clear that the trial judge's instructions did so.

## XII.

In separate counts the defendant was charged with the murder of David Piechowicz and of Susan Kennedy. In each count the State sought the death penalty, and in each instance the State advanced as an aggravating factor that "[t]he defendant committed more than one offense of murder in the first degree arising out of the same incident." Art. 27, § 413(d)(9). Appellant contends that it was error to allow the jury to find and consider this aggravating circumstance in each instance, because the Legislature intended that only one death sentence could be imposed where more than one person was murdered. We find no such legislative intent. Each murder was clearly a separate offense. The readily apparent intent of the Legislature in the enactment of the capital punishment statute was to permit consideration of the death penalty under the egregious circumstances of multiple first degree murders. There is no indication of an intent to allow the imposition of that punishment as a sanction for one but not all of the offenses. *Cf., Thomas v. State,* 301 Md. 294, 333–334, 483 A.2d 6 (1984), *cert. denied,* — U.S. —, 105 S.Ct. 1856, 85 L.Ed.2d 153 (1985).

## XIII.

The defendant's final contention is that the imposition of the death sentence in this case is disproportionate to the sentences imposed in similar cases. We disagree.

The murders giving rise to this prosecution were as heinous as those in any case to come before us under the present capital punishment statute. No killings could have been more premeditated and deliberate than those here. The defendant, who was 39 years old at the time, contracted for $9,000 to kill witnesses scheduled to appear in a federal narcotics trial. Using a MAC–11 machine pistol equipped with a silencer or noise suppressor, Evans coldly and deliberately gunned down two innocent persons in the lobby of a motel.

We have recently upheld a death sentence in a case where the sole aggravating circumstance was that the defendant committed more than one offense of first degree murder. *Thomas v. State, supra,* 301 Md. at 335, 483 A.2d 6. This case is more heinous because of the additional circumstance of contract murder.

The sentences here are not disproportionate to the sentences in similar cases. Moreover, we find that they were not imposed under the influence of passion, prejudice or an arbitrary factor, that the evidence supports the finding of a statutory aggravating circumstance, and that the evidence supports the jury's determination that the aggravating circumstances outweighed the one mitigating circumstance found.

JUDGMENT AFFIRMED.

McAULIFFE, Judge, concurring and dissenting.

I agree that the conviction should be affirmed, but I dissent from the decision to affirm the sentence of death.

The Court today holds that § 413(h) of Maryland's capital punishment statute places the burden of persuasion upon the State to prove by a preponderance of the evidence that aggravating circumstances outweigh mitigating circum-

stances before the penalty of death may be imposed. The Court further holds that Evans did not preserve for appellate review the adequacy of the jury instructions, and that in any event the instructions were correct.

I dissent, believing as to these issues that 1) the Court has rewritten the statute under pretense of interpretation, 2) the Court has failed to correctly apply the basic principles of *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975) and *In Re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed. 368 (1970), and 3) Evans has fully preserved his valid contentions for our consideration and should be afforded a new sentencing proceeding. Because the decision of the majority on these issues relies upon Part IV of the decision in *Foster v. State,* 301 Md. 294, 483 A.2d 6, [Nos. 43 & 91, September Term, 1984] (1985), filed today, and because I believe that holding to be in error as well, I address both opinions in this dissent.

## A

### *Interpretation of the Statute*

I emphatically disagree with the holding of the majority that Article 27, § 413(h) does not place the burden of persuasion upon the defendant as to the ultimate and critical question of whether he should live or die. It does precisely that, and in the following clear and unequivocal language:

(h) *Weighing mitigating and aggravating circumstances.*—(1) If the court or jury finds that one or more of these mitigating circumstances exist, it shall determine whether, by a preponderance of the evidence, the mitigating circumstances outweigh the aggravating circumstances.

(2) If it finds that the mitigating circumstances do not outweigh the aggravating circumstances, the sentence shall be death.

(3) If it finds that the mitigating circumstances outweigh the aggravating circumstances, the sentence shall be imprisonment for life.

Subsection (h)(1) frames one and only one question: Has it been shown by a preponderance of the evidence that the mitigating circumstances outweigh the aggravating circumstances? Subsections (2) and (3) do not pose other or different questions, but instead state in simple language the result that shall obtain depending upon how that single question is answered. If the answer is no, the sentence is death; if the answer is yes, the sentence is life.

In the name of statutory interpretation this Court in *Foster* rewrote subsection (h)(2), finding that subsections (2) and (3) were intended to pose separate questions. As interpreted by the majority, those sections should be read as follows:

(2) *If it finds that the aggravating circumstances outweigh the mitigating circumstances,* the sentence shall be death.

(3) If it finds that the mitigating circumstances outweigh the aggravating circumstances, the sentence shall be imprisonment for life.

The *Foster* majority then said:

If the Legislature had added a fourth paragraph to subsection (h), specifying the result if the sentencing authority found that mitigating and aggravating circumstances were in a state of even balance or if the sentencing authority was unable to determine *which outweighed the other,* there would have been a clear inference regarding the allocation of the burden or risk.

304 Md. 297, 498 A.2d 1184 (Emphasis added.)

The conclusion of the *Foster* majority is incorrect in two respects. First, the legislature said nothing about aggravating circumstances outweighing mitigating circumstances, but spoke only of whether the mitigating circumstances outweighed the aggravating circumstances; and second, the

legislature clearly placed the burden of persuasion as to this question on the defendant.

I acknowledge the familiar proposition that "where there are two possible constructions, and one of them makes a statute of doubtful constitutionality, courts will adopt that view of the enactment which establishes it free of fundamental objections." *State v. Petrushansky*, 183 Md. 67, 70, 36 A.2d 533 (1944). I differ with the majority in my inability to find two possible constructions of the plain language of § 413(h). At the root of our disagreement is the majority's belief that the phrase "mitigating circumstances do not outweigh aggravating circumstances" means the same as "aggravating circumstances outweigh mitigating circumstances," and I cannot accept that proposition. *Webster's Third New International Dictionary* 1605 (1963) defines "outweigh" as "to exceed in weight, value or importance," and I am unaware of any contrary connotation or usage. *Roget's International Thesaurus*, § 36.6, (4th ed. 1977) lists "preponderate" as a synonym of "outweigh."

In *Foster* this Court said that a "principal misunderstanding" of our death statute is that it places the burden on the capital defendant to convince the sentencing authority that mitigating circumstances outweigh the aggravating circumstances, and then held that the Maryland statute places no such burden on the defendant. I disagree, and more importantly, I am persuaded that § 413(h) has been consistently interpreted by trial judges, jurors and attorneys throughout this State as placing precisely that burden upon the defendant.

First, as to the existence of any burden, it is clear from the language of § 413(c)(3) that the legislature intended to establish a burden of proof in § 413(h),[1] and to require that

---

1. "Burden of proof" may mean the burden of producing evidence or the burden of persuasion, or both. *McCormick on Evidence* § 336 (E. Cleary 3d ed. 1984). Because subsection (h) deals solely with the weighing of evidence already produced, the burden of proof with respect to that subsection means the burden of persuasion. The

the jury be instructed as to that burden. Section 413(c)(3) provides:

> After presentation of the evidence in a proceeding before a jury, in addition to any other appropriate instructions permitted by law, the court shall instruct the jury as to the findings it must make in order to determine whether the sentence shall be death or imprisonment for life and [as to] the *burden of proof applicable to these findings in accordance with subsection ... (h).* (Emphasis added.)

Implicit in the language of subsection (h) is the conclusion that the burden of persuasion to prove that the mitigating circumstances outweigh the aggravating circumstances is upon the defendant. This conclusion becomes even more apparent if one substitutes the correlative term "risk of nonpersuasion"[2] for that of "burden of persuasion," and considers who will lose if the proposition is not made out. Clearly it is the defendant who will lose, and lose dearly, if the sentencing authority is not persuaded that the mitigating circumstances outweigh the aggravating circumstances. If, for example, the sentencing authority finds that the aggravating and mitigating factors are equally balanced, it must by definition find that the mitigating do not outweigh the aggravating circumstances and in that event our statute mandates death. The risk of nonpersuasion is evident.

It is puzzling that the majority in *Foster* has no difficulty in finding that subsection (d) implicitly places the burden of persuasion upon the State to prove the existence of aggravating circumstances, and that subsection (g) implicitly places the burden of persuasion on the defendant to prove the existence of mitigating circumstances, but is unable to

---

burden of proof should not be confused with the standard (or measure) of proof. The former addresses the issue of which party must produce evidence or persuade; the latter addresses the question of the quantity or quality of evidence necessary to fulfill the burden of persuasion.

**2.** *See McCormick on Evidence* § 336, n.4 (E. Cleary 3d ed. 1984).

fathom the implication of subsection (h)(1) even though nearly identical language is used in subsections (g) and (h)(1). A comparison of the three subsections and the interpretation of the majority as to each should make the point:

(d) ... [T]he court or jury ... shall first consider whether, beyond a reasonable doubt, any of the following aggravating circumstances exist....

(Majority holds burden on State—beyond a reasonable doubt.)

(g) ... [T]he court or jury ... shall then consider whether, based upon a preponderance of the evidence, any of the following mitigating circumstances exist....

(Majority holds burden on defendant—preponderance of the evidence.)

(h)(1) ... [T]he court or jury ... shall determine whether, by a preponderance of the evidence, the mitigating circumstances outweigh the aggravating circumstances.

(Majority holds burden on *State* —preponderance of the evidence.)

It is clear to me that the Rules Committee of this Court also interpreted § 413(h) to place the ultimate burden of persuasion upon the defendant. Maryland Rule 4–343 mandates the use of a Findings and Sentencing Determination form in capital sentencing proceedings, and the language and structure of that form will leave no doubt in the mind of the user as to which party has the burden of persuasion. Sections I and II provide for the listing of those aggravating and mitigating circumstances found to exist. Section III poses the ultimate question to be decided in those cases in which at least one aggravating and one mitigating circumstance are found, and the sentence that must be imposed depending upon how that question is answered.

Section III

Based on the evidence, we unanimously find that it has been proven by A PREPONDERANCE OF THE EVIDENCE that the mitigating circumstances marked "yes" in Section II outweigh the aggravating circumstances marked "yes" in Section I. . . . . . .

yes no

DETERMINATION OF SENTENCE

Enter the determination of sentence either "Life Imprisonment" or "Death" according to the following instructions:

1. . . .

2. If Section III was completed and was marked "yes," enter "Life Imprisonment."

3. . . .

4. If Section III was completed and was marked "no," enter "Death."

Nowhere in this form, nor in Rule 4–343, nor indeed in the Maryland Death Penalty Statute will one find any mention of the necessity of considering whether aggravating circumstances outweigh mitigating circumstances. That significantly different question has been constructed by the majority in an obvious attempt to avoid the constitutional implication of forcing a defendant to shoulder the burden of persuading the sentencing authority he should not be put to death.

### B

### *The Constitutional Issues*

By a pretrial motion to dismiss the State's notice of intention to seek the death penalty, and by exceptions timely taken to instructions given the jury, Appellant argued to the trial judge that the statute unconstitutionally cast the burden upon the defendant to prove that the mitigating circumstances outweighed the aggravating circumstances.[3] The question thus posed is difficult and im-

---

3. Appellant also contended the statute is unconstitutional because 1) it mandates death if at least one aggravating circumstance is found and no mitigating circumstance is found, and 2) it casts upon the defendant the burden of proving the existence of mitigating circumstances. The first of these arguments is not before us because the jury found the existence of a mitigating circumstance. Concerning the second argument, I agree with the majority in *Foster* that there is no constitutional infirmity in requiring a defendant to prove, by a preponderance of the evidence, the *existence* of mitigating circumstances. Knowledge of the nature and existence of mitigating circumstances is pecu-

portant. It is not answered by black letter law from antecedent cases, but by careful application of accepted principles underlying the law in analogous situations.

I am persuaded that this portion of our death penalty statute is unconstitutional, and that the jury was improperly instructed concerning the ultimate burden of persuasion.

In allocating the ultimate burden of persuasion to the defendant our legislature quite likely tracked similar provisions of the Florida death penalty statute that survived constitutional attack in *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). Fla.Stat.Ann. § 921.-141(2)(b) and (c) (Supp.1976–77) required the jury to consider "[w]hether sufficient mitigating circumstances exist ... which outweigh the aggravating circumstances found to exist" and § 921.141(3) required the trial judge [4] to certify that "sufficient [statutory] aggravating circumstances exist ... and ... [t]hat there are insufficient [statutory] mitigating circumstances ... to outweigh the aggravating circumstances" before the death penalty could be imposed. Although the Florida death penalty statute survived every constitutional attack made upon it in *Proffitt*, the precise question now presented appears not to have been raised in that case, probably because the trial judge had found specifically that none of the statutory mitigating circumstances existed. I note, however, the recent determination of the Supreme Court of Florida that an instruction which allocates to the defendant the burden of proving that mitigating circumstances outweigh aggravating circumstances may be constitutionally impermissible. In *Arango v. State*, 411 So.2d 172, 174 (Fla.1982), that court stated:

> In the present case, the jury instruction, if given alone, may have conflicted with the principles of law enunciated

---

liarly with the defendant, and the convenience of proof will as well be with him. *Patterson v. New York*, 432 U.S. 197, 209, 97 S.Ct. 2319, 2326, 53 L.Ed.2d 281 (1977).

**4.** Under the Florida Statute the jury's verdict is advisory only. The actual sentence must be determined by a trial judge.

in *Mullaney* and *Dixon* [*State v. Dixon,* 283 So.2d 1 (Fla.1973), *cert. denied,* 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974) ]. A careful reading of the transcript, however, reveals that the burden of proof never shifted. The jury was first told that the state must establish the existence of one or more aggravating circumstances before the death penalty could be imposed. Then they were instructed that such a sentence could only be given if the state showed the aggravating circumstances outweighed the mitigating circumstances. These standard jury instructions taken as a whole show that no reversible error was committed.

In *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) and *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), decided on the same day as *Proffitt,* this question was not presented for review. The statutes of Georgia and Texas provided for ultimate weighing of aggravating against mitigating circumstances, but were silent as to the burden of proof on that issue.

The resolution of this important issue lies in the proper application of the principles of *Winship, Mullaney* and *Patterson v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977), to the final stage of decision making in the sentencing phase of a capital punishment case. Because the holdings in those cases deal with the adjudicatory stage of a criminal trial they are not susceptible of direct application to the procedures involved in fixing the penalty in a death case, so that careful attention to the principles involved in the rationale underlying the decisions is required.

*Winship* and *Mullaney* confirm the basic principle that due process protects an accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. *Winship* extends this protection to juvenile delinquency proceedings because of the potentially serious consequences of an adjudication of delinquency. *Patterson* does not

retreat from this basic principle, but makes clear the right of the states to allocate to the defendant the burden of proving an affirmative defense. Central to the holding in *Patterson* is the proposition that the state must shoulder the burden of proof beyond a reasonable doubt as to every fact necessary to prove the principal issue, *i.e.* that the crime charged was committed by the accused, and no burden may be placed upon the defendant with respect to any essential element of the crime or with respect to identification of the offender. Only where the state has provided for mitigation or for relief from criminal sanctions upon the showing of separate facts may the state cast the burden of establishing those facts upon the defendant. Thus, in *Patterson* where the crime of murder was established by proof that the defendant intentionally caused the death of another person it was constitutionally proper to require the defendant to establish that he acted under the influence of extreme emotional disturbance to reduce the crime to manslaughter.

In a sentencing proceeding conducted pursuant to our death penalty statute the State bears the burden of proving beyond a reasonable doubt that the defendant committed the crime of murder in the first degree, that the defendant was a principal in the first degree or procured the murder for hire, and that one or more statutory aggravating circumstances exist. The defendant must then shoulder the burden of proving by a preponderance of the evidence the existence of any mitigating circumstances. To this point the process is in harmony with the principles established by *Winship, Mullaney* and *Patterson.*

Beyond this point, however, the opportunity for direct application of established rules ends. In the adjudicatory stage of a criminal case the matter is complete and the result is known when this stage is reached. Utilizing *Patterson* for illustration, if the State has proven the murder but the defendant has not proven the existence of the mitigating circumstances, the verdict is murder. If, on the other hand, the defendant has proven the mitigating circum-

stances, the verdict is manslaughter. But in a capital sentencing proceeding the production of evidence and proof of existence of aggravating and mitigating circumstances does not produce an automatic result, but simply sets the stage for the all-important final phase of considering the total circumstances and determining the ultimate issue—whether the defendant should be put to death. Concerning this central issue there must be a burden of persuasion—a risk of nonpersuasion. Who is to lose if the mind of the sentencing authority is in a state of equipoise after consideration of all the circumstances? And the standard of proof must be established. Must the sentencing authority be persuaded one way or the other by a preponderance of the evidence, by clear and convincing evidence, or by proof beyond a reasonable doubt? The decision maker must be given the answers to these questions to make an intelligent decision. Professor Wigmore explains the need for a standard of proof in these words:

After the tribunal having the function of deciding upon facts, *i.e.* the jury, has retired to reach and frame its decision, a question arises as to the *quality,* or *degree of its persuasion.* Here, it is to be noticed we are no longer concerned with the incidence of the duty or burden of proof as between the *parties* to the cause, but merely with the *tribunal's own duty* and conduct as to its *standard of persuasion.*

Now the logical notion involved in the situation is that the tribunal must be persuaded to believe the affirmation of the burden-bearer before it can be asked to act as desired, but that this persuasion or conviction in the mind of the tribunal may have more than one degree or quality of positiveness; and an attempt is made by the law to define the degree of positiveness or persuasion which must exist in order to justify action in the shape of a verdict for the burden-bearer.

9 Wigmore, Evidence § 2497 (3d ed. 1940).

To the same effect, *see Addington v. Texas*, 441 U.S. 418, 423–27, 99 S.Ct. 1804, 1808–10, 60 L.Ed.2d 323 (1979), in which the Court said:

> The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to "instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." *In re Winship*, 397 U.S. 358, 370, 90 S.Ct. 1068, 1076, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring). The standard serves to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision.
>
> \* \* \* \* \* \*
>
> In cases involving individual rights, whether criminal or civil, "[t]he standard of proof [at a minimum] reflects the value society places on individual liberty."
>
> [*Tippett v. Maryland*, 436 F.2d 1153, 1166 (4th Cir.1971)].
>
> \* \* \* \* \* \*
>
> Increasing the burden of proof is one way to impress the factfinder with the importance of the decision and thereby perhaps to reduce the chances that inappropriate commitments will be ordered.

It is difficult to conceive of a situation where the necessity of impressing the factfinder with the importance of the decision is greater than in the case of a jury charged with the weighing of aggravating and mitigating circumstances and the decision as to whether the defendant should die. The death penalty can be constitutionally imposed only if the procedure ensures reliability in the determination that "death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976).

Drawing upon the basic principles of *Winship*, *Mullaney* and *Patterson*, I conclude due process requires that the burden of persuasion on this ultimate issue must be upon the State, and the jury must be persuaded beyond a reason-

able doubt that the aggravating circumstances outweigh the mitigating circumstances before the penalty of death can be imposed. The importance of the issue to be decided and the societal interest in attempting to ensure an accurate decision are quite apparent, and the Supreme Court has made it clear that the allocation of the burden of persuasion to the State and the use of the reasonable doubt standard are mandated when the decision will involve loss of liberty or stigma of criminal conviction.

*Winship* is concerned with substance rather than ... formalism. The rationale of that case requires an analysis that looks to the "operation and effect of the law as applied and enforced by the State," *St. Louis S.W.R. Co. v. Arkansas*, 235 U.S. 350, 362, 35 S.Ct. 99, 102, 59 L.Ed. 265 (1914), and to the interests of both the State and the defendant as affected by the allocation of the burden of proof.

In *Winship* the Court emphasized the societal interests in the reliability of jury verdicts:

"The requirement of proof beyond a reasonable doubt has [a] vital role in our criminal procedure for cogent reasons. The accused during a criminal prosecution has at stake interests of immense importance, both because of the possibility that he may lose his liberty upon conviction and because of the certainty that he would be stigmatized by the conviction. ...

"Moreover, use of the reasonable-doubt standard is indispensable to command the respect and confidence of the community in applications of the criminal law. It is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned." 397 U.S., at 363, 364.

\* \* \* \* \* \*

Not only are the interests underlying *Winship* implicated to a greater degree in this case, but in one respect the protection afforded those interests is less here. In *Win-*

*ship* the ultimate burden of persuasion remained with the prosecution, although the standard had been reduced to proof by a fair preponderance of the evidence. In this case, by contrast, the State has affirmatively shifted the burden of proof to the defendant. The result, in a case such as this one where the defendant is required to prove the critical fact in dispute, is to increase further the likelihood of an erroneous murder conviction.

*Mullaney v Wilbur*, 421 U.S. at 699–701, 95 S.Ct. at 1889–91 (footnotes omitted).

The interests underlying *Winship* are most certainly implicated in the excruciating process of balancing circumstances to determine whether a defendant should be put to death.

[T]he penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

*Woodson v. North Carolina*, 428 U.S. at 305, 96 S.Ct. at 2991.

In *Baldwin v. Alabama*, —— U.S. ——, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985), the issue presented by this case was not raised, but we note that in interpreting § 13–11–4 of the Alabama Death Penalty Statute, which is silent as to the appropriate burden and standard of persuasion, the Supreme Court said:

The judge's discretion is guided by the requirement that the death penalty be imposed only if the judge finds the aggravating circumstance that serves to define the capital crime—in this case the fact that the homicide took place during the commission of a robbery—and only if the judge finds that the definitional aggravating circumstance, plus any other specified aggravating circum-

stance, outweighs any statutory and nonstatutory mitigating circumstances.

*Id.* at ——, 105 S.Ct. at 2732–33 (footnote omitted).

I believe the views expressed by this dissent are consistent with the views expressed by Justice Marshall in his dissent from the denial of certiorari in *White v. State,* —— U.S. ——, 105 S.Ct. 1779, 84 L.Ed.2d 837 (1985), and *Stebbing v. Maryland,* —— U.S. ——, 105 S.Ct. 276, 83 L.Ed.2d 212 (1984), and by Justice Stevens in a similar dissent in *Smith v. North Carolina,* 459 U.S. 1056, 103 S.Ct. 474, 74 L.Ed.2d 622 (1982).

## C

### *Preservation of Issues for Appellate Review*

The majority agrees that at the trial level Appellant specifically challenged the constitutionality of that portion of the statute which allocated to the defendant the burden of persuasion on the ultimate sentencing determination, and seasonably noted exceptions to the instructions that accomplished the same result. The majority suggests, however, that he failed to preserve this issue for appellate review by failing to include any argument on the question in his brief. I disagree. At pages 81–87 of his brief, under the heading "The Maryland Capital Penalty Statute is Unconstitutional" Appellant argued:

[I]n at least two respects—mandatoriness and a defendant's burdens—the Maryland procedure is substantially different from procedures found constitutional by the Supreme Court. As Justice Marshall, joined by Justice Brennan, pointed out in his dissent to the Supreme Court's denial of a petition for writ of certiorari in *Stebbing v. Maryland,* [—— U.S. ——], [105 S.Ct. 276] 83 L.Ed.2d 212 (1984), serious flaws exist in Maryland's statutory scheme. Specifically, the statute places two different burdens of proof upon the defendant at the sentencing stage....

Art. 27, Sec. 413, as implemented by Md. Rule 772A, not only places the burden on the capital defendant "to convince [the sentencer] that mitigating circumstances outweigh [ ] the aggravating circumstances," *Tichnell v. State*, 290 Md. 43, 61, 427 A.2d 991 (1981), but further requires the sentence of death once the bare existence of a statutory aggravating factor is established if the defendant fails to meet his burden of proof and persuasion. Thus, in this state a sentence of death in circumstances may be mandated where the sentencer is unconvinced that death is the appropriate punishment. This procedure is inconsistent with the Supreme Court's repeated insistence that state procedures assure "reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina, supra*, 428 U.S. at 305, 96 S.Ct. at 2991.

\* \* \* \* \* \*

Maryland law, therefore, differs dramatically from the statutes of the majority of the states which permit the jury or judge to return a life sentence even where no "mitigating circumstances" are found or which place upon the prosecution the ultimate burden of persuasion on the question of life or death, in some instances beyond a reasonable doubt [citing statutes of eighteen states].

Appellant then quotes from Justice Stevens' opinion dissenting from denial of certiorari by the Supreme Court in *Smith v. North Carolina, supra*, including the following quotation from *State v. Wood*, 648 P.2d 71, 83 (Utah 1982):

It is our conclusion that the appropriate standard to be followed by the sentencing authority—judge or jury—in a capital case is the following:

"After considering the totality of the aggravating and mitigating circumstances, you must be persuaded beyond a reasonable doubt that total aggravation outweighs total mitigation, and you must further be persuaded, beyond a reasonable doubt, that the imposition of the death penalty is justified and appropriate in the circumstances."

"These standards require that the sentencing body compare the totality of the mitigating against the totality of the aggravating factors. Not in terms of the relative numbers of the aggravating and the mitigating factors, but in terms of their respective substantiality and persuasiveness. Basically, what the sentencing authority must decide is how compelling or persuasive the totality of the mitigating factors are when compared against the totality of the aggravating factors. The sentencing body, in making the judgment that aggravating factors 'outweigh,' or are more compelling than, the mitigating factors, must have no reasonable doubt as to that conclusion, and as to the additional conclusion that the death penalty is justified and appropriate after considering all the circumstances."

Appellant concludes his argument on this issue with the following:

In perhaps no other area of the law has the need for reliability in the decisional process been stressed as it has been in the capital punishment context. In other areas where the Supreme Court has perceived a need to minimize the risk of error in the adjudicatory process, it has not hesitated to place a heightened standard of proof upon the party seeking to change the *status quo*. *See, e.g., Santosky v. Kramer*, 455 U.S. 745 [102 S.Ct. 1388, 71 L.Ed.2d 599] (1982); *Addington v. Texas*, 441 U.S. 418 [99 S.Ct. 1804, 60 L.Ed.2d 323] (1979); *In Re: Winship*, 397 U.S. 358 [90 S.Ct. 1068, 25 L.Ed.2d 368] (1970). The Maryland scheme, however, permits the capital sentencing decision to be made on the basis of the "preponderance of evidence standard," which "by its very terms demand[s] consideration of the quantity, rather than the quality of evidence," *Santosky v. Kramer, supra,* at 764, 102 S.Ct. at 1400, and "is quite consistent with want of belief." Trickett, "Preponderance of Evidence and Reasonable Doubt," 10 Dick.L.Rev. 76 (1906). Moreover, it places the ultimate burden of both production and persua-

sion on the capital defendant, who must be executed if he fails in that regard.

The failure of Appellant to specifically argue that instructions which precisely track the language of the statute are similarly flawed is understandable. Reasonably prudent counsel could assume that if we found that the language of the statute impermissibly imposed the ultimate burden upon the defendant and/or permitted use of a standard of persuasion less than that constitutionally mandated, instructions to the same effect would be similarly disapproved. It is only the extraordinary "interpretation" of the statute by the majority that creates the present dilemma.[5] In previous capital cases we have relaxed the ordinarily strict application of the principle of waiver, *Johnson v. State,* 292 Md. 405, 412 N.4, 439 A.2d 542 (1982); *Bartholomey v. State,* 260 Md. 504, 513, 273 A.2d 164 (1971), and we should do so in this case. Particularly is that so where the issue was carefully preserved below and all relevant arguments have been presented to us, albeit as a challenge to the constitutionality of a portion of the statute.

---

**5.** The majority in *Foster* concedes there may have been some "misunderstanding" of the statute as "authoritatively interpreted" in *Tichnell v. State,* 287 Md. 695, 720–37, 415 A.2d 830 (1980) (*Tichnell I*) and *Calhoun v. State,* 297 Md. 563, 635–38, 468 A.2d 45 (1983). I find the single statement made in *Tichnell I,* 287 Md. at 730, 415 A.2d 830, inadequate in the context of that case and in the context of the capital cases decided thereafter by this Court to effectively convey the import of the interpretation today clearly announced by the Court in *Foster.* The "authoritative interpretation" of *Calhoun* consists of nothing more than a repetition of the statement made in *Johnson v. State,* 292 Md. 405, 439 A.2d 542 (1982), that the argument was "thoroughly considered and rejected" in *Tichnell I.* The frequency with which defense counsel have argued since *Tichnell I* that the statute improperly places the burden of ultimate persuasion upon the defendant, and the failure of experienced and able defense counsel to argue for an instruction to the opposite effect upon the authority of *Tichnell I* suggests to me that the "interpretation" announced by *Foster* must be ranked among the best kept secrets in this State. All counsel and the learned trial judge in the instant case were understandably led to believe that the burden was upon the defendant by the language of our capital cases subsequent to *Tichnell I,* as well, of course, by the language of the statute.

D

*Erroneous Instructions*

Judge Cathell instructed the jury on this issue in the following words:

> If you find that no mitigating factor has been proven by a preponderance of the evidence and all of the mitigating factors are marked no on the verdict form and you have previously found that an aggravating factor exists beyond a reasonable doubt, then the sentence must be death. If, however, you find that one or more of the mitigating circumstances exist, you shall determine whether, by a preponderance of the evidence, the mitigating circumstances outweigh the aggravating circumstances.
>
> If you find that the mitigating circumstances do not outweigh the aggravating circumstances, the sentence shall be death.
>
> If you find that the mitigating circumstances outweigh the aggravating circumstances, the sentence shall be imprisonment for life.

Judge Cathell provided each juror with a copy of the Findings and Sentencing Determination form to follow during his instructions, and instructed the jury that "the law and the rules of procedure require you to use the forms we are providing for you." As required by Rule 4–343, Section III of the form posed the ultimate question in the following language:

> Based on the evidence, we unanimously find that it has been proven by A PREPONDERANCE OF THE EVIDENCE that the mitigating circumstances marked "yes" in Section II outweigh the aggravating circumstances marked "yes" in Section I. . . . . . .
> yes no

The jury answered that question in the negative and thereby determined the sentence to be death.

If the statute unconstitutionally places the ultimate burden upon the defendant, it is clear that the instructions were erroneous.

However, even if the majority is correct in its conclusion that the words of the statute may be interpreted to the contrary, it is the antithesis of reality and common sense to suggest that the instructions conveyed any such message to the jury. It is distressing to accept a judicial construction that black is white; it is folly to suggest that jurors will arrive at the same conclusion. No fair-minded juror could possibly understand from these instructions that the burden was upon the State to prove by a preponderance of the evidence that the aggravating circumstances must outweigh the mitigating circumstances before a sentence of death could be returned. The erroneous instructions compel vacation of the sentence and remand for a new sentencing proceeding upon either interpretation of the statute. To hold otherwise and to fail to correct Rule 4–343 by an emergency rules order is to perpetuate confusion and error in a most important area of criminal jurisprudence.

## CONCLUSION

As much as I dislike the prospect of the substantial expense and inconvenience of affording new sentencing hearings in a significant number of cases, I dislike even more the prospect of sending to their deaths those who have been sentenced based upon a misunderstanding of the proper burden and standard of proof. An enlightened society should impose the ultimate sanction upon an individual only in those cases where it has carefully observed the most basic concepts of fairness. I would vacate the sentence of death and remand this case for a new sentencing proceeding.